**UNITED STATES of America, Appellee,**

v.

**James M. GABRIEL, Gerard E. Vitti, Defendants–Appellants.**

**Nos. 1597, 1598, Dockets 96–1654, 96–1655.**

United States Court of Appeals, Second Circuit.

Argued June 2, 1997.

Decided Sept. 23, 1997.

90

Nathan Lewin, Washington, DC (R. Stan Mortenson, Barry J. Pollack, Daniel J. Cloherty, Miller, Cassidy, Larroca & Lewin, Washington, DC, of counsel), for Appellant Gabriel.

Thomas Fitzpatrick, New York City (Patricia Moran, New York City, of counsel), for Appellant Vitti.

Elliott B. Jacobson, Assistant United States Attorney, Southern District of New York, New York City (Mary Jo White, United States Attorney, Guy Petrillo, Assistant United States Attorney, Southern District of New York, New York City, of counsel), for Appellee.

Before MESKILL, JACOBS and LEVAL, Circuit Judges.

MESKILL, Circuit Judge:

After a six-week jury trial before the United States District Court for the Southern District of New York, Rakoff, J., defendants were convicted of mail fraud, 18 U.S.C. § 1341, wire fraud, 18 U.S.C. § 1343, making false statements within the jurisdiction of a federal agency, 18 U.S.C. § 1001, and witness tampering, 18 U.S.C. § 1512(b). On appeal, the defendants challenge their convictions and their sentences on numerous grounds. We decide that (1) the district court properly refused to grant the defendants' motion for a bench trial; (2) the defendants were not prejudiced by the government's evidence or the prosecutor's comments; (3) although the district court erred in instructing the jury on the intent element of mail and wire fraud, the error did not prejudice defendants; (4) al-

though 18 U.S.C. § 2(b), which makes principals liable for the acts of their innocent intermediaries, uses the term "willfully," the section does not require the government to prove a defendant knew his actions were unlawful; (5) although the Supreme Court has incorporated a "likely to affect" a judicial proceeding requirement into the omnibus clause of the obstruction of justice section, 18 U.S.C. § 1503, no such requirement should be incorporated into the witness tampering section, 18 U.S.C. § 1512(b); (6) there was no "retroactive misjoinder;" (7) one defendant should be resentenced because the district court did not determine whether the defendant committed trial perjury by clear and convincing evidence; (8) the district court's order imposing restitution on one of the defendants should be reconsidered in light of the Mandatory Victims Restitution Act of 1996; and (9) the district court should reconsider its order departing upward on a fine imposed on one of the defendants, as the court departed without providing the defendant notice.

We affirm defendants' convictions and remand for resentencing.

## BACKGROUND

Defendants-appellants James M. Gabriel and Gerard E. Vitti were both executive vice presidents at Chromalloy Research and Technology Division (CRT), a division of Chromalloy Gas Turbine Corporation. CRT is one of the nation's largest jet engine repair stations serving most of the world's airlines.

In 1992, the government learned that CRT was misrepresenting the nature of some of its jet engine repairs. After an extensive investigation Gabriel and Vitti were indicted on multiple counts of mail fraud, wire fraud and making false statements to the Federal Aviation Administration (FAA). Gabriel was indicted separately for witness tampering. After a six-week trial, a jury convicted Gabriel on two counts of mail fraud, two counts of wire fraud, two counts of making false statements to the FAA, and one count of witness tampering. Vitti was convicted on

one count of wire fraud. We discuss the evidence that led to the convictions below.

### A. The Bearing Seal Scheme

Pratt & Whitney (Pratt) manufactures JT9D jet engines commonly used on wide-bodied passenger jet aircraft. Due to internal wear, the bearing seals on JT9D engines require periodic repair. The repair consists of removing "knife-edges" from the bearing seal and welding on new knife-edges using "welding wire." Pratt's repair manuals mandated that welding wire "Inconel 901" be used for the repair.

In 1986, when attempting to use Inconel 901 to repair bearing seals, CRT experienced a proliferation of cracks in the replacement knife-edges. Apparently, CRT possessed neither the technology nor the expertise to repair the bearing seals using Inconel 901. Rather than forgo the business, Gabriel directed Jeffrey Thyssen,[1] the CRT employee in charge of the welding, to use "Hastelloy W" welding wire instead of Inconel 901. Hastelloy W is softer than Inconel 901 and easier to work with. Although Thyssen informed Gabriel that Pratt's repair manual mandated that Inconel 901 be used for the repair, Gabriel nevertheless directed Thyssen to use Hastelloy W.

From 1986 to 1989, CRT repaired approximately 645 bearing seals with Hastelloy W. CRT returned the bearing seals to its customers with packing slips that falsely stated that the bearing seals had been repaired in accordance with Pratt's specifications.

In the summer of 1989, Air India was testing engines that CRT had repaired and five bearing seals failed. Air India sent the failed bearing seals to CRT and to Pratt for a determination why the seals had failed. Pratt's tests revealed that the seals had failed because of the improper use of Hastelloy W.

Aware that the improper use of Hastelloy W either had been or would be discovered, Gabriel and other CRT officials devised a plan to conceal the use of Hastelloy W. They decided to claim that Hastelloy W had been used accidentally and only to repair a limited

---

1. Thyssen testified under a court order compelling him to testify under a grant of immunity.

number of seals, rather than disclosing that more than 600 other seals also had been repaired with Hastelloy W. In furtherance of this cover-up, Gabriel ordered the preparation of a back-dated document that falsely stated that it was CRT's standard procedure to use Inconel 901 for the bearing seal repair. This document was placed in CRT's files.

CRT eventually entered into settlement negotiations with Air India over the failed bearing seals. During those negotiations, in an attempt to obtain more favorable settlements, Gabriel and Vitti falsely represented to Air India via fax that Hastelloy W had been used accidentally. CRT and Air India eventually settled their disputes.

Based on the above, the jury found that (1) Gabriel committed mail fraud, because he misrepresented the nature of the bearing seal repairs to CRT's customers, some of whom paid CRT through the mails; (2) Gabriel and Vitti committed wire fraud based on the fax sent during settlement negotiations with Air India; and (3) Gabriel made false statements within the jurisdiction of the FAA, because the back-dated document that Gabriel ordered prepared was maintained in CRT's files, which were subject to FAA inspection. Vitti was acquitted on the false statements count.

According to the record, although hundreds of bearing seals were repaired with Hastelloy W and those bearing seals flew many hours, Air India is the only airline to experience any problems with these bearing seals. Moreover, we understand that by now all the improperly repaired bearing seals have been replaced, and that it is highly unlikely that the bearing seal scheme presents any continuing threat to air travelers.

## B. *The LPT Case Scheme*

In 1990, Qantas Airline contracted with CRT to repair a low pressure turbine (LPT) case. Gabriel repeatedly misled Qantas into believing that CRT would perform the repair when Gabriel knew that the work was to be performed at a related facility in Florida with which Qantas earlier had experienced problems.

After the Florida facility repaired the LPT case, the LPT case was shipped to CRT for transhipment to Qantas. A CRT quality control inspector inspected the part and determined that it had been damaged and was "irreparable scrap." Nevertheless, Gabriel ordered the LPT case shipped to Qantas after some purely cosmetic work was done. The packing slip that accompanied the LPT case falsely stated that the LPT case was suitable to be returned to service. Moreover, Gabriel sent a fax to Qantas falsely stating that the LPT case was "100% serviceable."

Qantas put the LPT case into service, and the LPT case flew approximately 1,200 hours until the FAA discovered the improper repair and directed Qantas to remove the LPT case from use. Subsequent inspection revealed that the LPT case was unserviceable and that as a result of the improper repair, it had started to come apart.

Based on these events, the jury concluded that (1) Gabriel committed mail fraud, because Qantas paid CRT through the mails; (2) Gabriel committed wire fraud, because Gabriel represented via fax to Qantas that the part was "100% serviceable"; and (3) Gabriel made false statements within the jurisdiction of the FAA, because a copy of the false packing slip subject to FAA inspection was maintained in CRT's files. Vitti was acquitted on each of these counts.

## C. *Witness Tampering*

When a grand jury began to investigate Gabriel's involvement in the LPT case scheme, CRT hired outside counsel to determine what had happened. When CRT's counsel asked Gabriel about the repair, Gabriel falsely stated that he had previously disclosed to Qantas that the LPT case was only partially serviceable. Further, in an attempt to support that story, Gabriel sent a fax to Donald Mealing, the Qantas representative with whom Gabriel had dealt. The fax was headed "ONGOING GOVT INVESTIGATION AT CRT," and stated, in pertinent part:

> I am going to call you with our attorneys within the next several days.... The questions they will ask you are relative to

your memory of our meeting in [Sydney] at [Qantas] covering acceptance criteria and the very nature of this case that it was difficult to salvage. It is important that you think this through before they talk on the issue. Note *I've cited the case* had [numerous problems].... All of these points supported the case was a "dog" but *we shipped it as partially serviceable.*

(capitalization altered and emphasis added).

For sending that fax, Gabriel was charged with witness tampering. The government's theory was that Gabriel was attempting to mislead Mealing into believing that Gabriel had previously disclosed to Qantas that the case was "partially serviceable," and that Gabriel intended Mealing to believe that lie and to repeat it to the grand jury.

## DISCUSSION

On appeal, defendants make a variety of challenges to their convictions and to their sentences. We affirm their convictions but remand for resentencing.

### A. *Defendant's Motion for a Bench Trial*

■ Before trial, Vitti and Gabriel each waived their right to a jury trial and moved for a bench trial. However, the government refused to agree to a bench trial and the district court denied defendants' motions. Defendants were therefore tried by a jury. On appeal, defendants assert that denying them a bench trial was error.

Federal Rule of Criminal Procedure 23(a), entitled "Trial by Jury," provides: "Cases required to be tried by jury shall be so tried unless the defendant waives a jury trial in writing with the approval of the court and the *consent of the government*" (emphasis added). The Supreme Court has found Rule 23(a)'s requirement that the government consent to a bench trial to be constitutional, stating, in pertinent part, that:

Trial by jury has been established by the Constitution as the "normal and ... preferable mode of disposing of issues of fact in criminal cases."

... The Constitution recognizes an adversary system as the proper method of determining guilt, and the Government, as a litigant, has a legitimate interest in seeing that cases in which it believes a conviction is warranted are tried before the tribunal which the Constitution regards as most likely to produce a fair result.

*Singer v. United States,* 380 U.S. 24, 35–36, 85 S.Ct. 783, 790, 13 L.Ed.2d 630 (1965) (citation omitted).

However, the *Singer* Court did not decide "whether there might be some circumstances where a defendant's reasons for wanting to be tried by a judge alone are so compelling that the Government's insistence on trial by jury would result in the denial to a defendant of an impartial trial." *Id.* at 37, 85 S.Ct. at 791. Defendants here argue that a number of factors were so compelling that the district court's denial of their motions for a bench trial warrants reversal. We assume, without deciding, that compelling circumstances could arise that would justify granting a bench trial over government objection. However, none of the factors cited by defendants amounts to such compelling circumstances, and only two of those factors warrant any discussion.[2]

First, defendants argue that all jurors fear flying and that this fear would arouse the jurors' passions against defendants. However, those potential jurors who expressed concern about sitting on this case because of a fear of flying were excused. Although a case might arise in which a fair and impartial jury could not be impaneled through this procedure, we see no reason to believe that a fair and impartial jury was not impaneled for this case. *See United States v. Moon,* 718 F.2d

---

2. In total, the defendants cite six factors in support of the motion for a bench trial. These factors include (1) the risk that jurors would not be able to separate their fear of flying from the issues of the case; (2) the substantial risk of prejudicial spillover on defendant Vitti of evidence against defendant Gabriel concerning (a) the use of "Hastelloy W" before Vitti was employed at CRT, and (b) an obstruction of justice involving the LPT case; (3) the complicated nature of the facts; (4) savings to the defendants in time and money; (5) the government's lack of any reason (other than policy) to oppose the bench trial; and (6) the impact on the right of *other* defendants to have their cases tried efficiently and expeditiously due to the extra time required for the district court to try the matter to a jury.

1210, 1218–19 (2d Cir.1983) (holding that refusal to grant defendant, the Reverend Sun Myung Moon, a bench trial was not error because defendant was adequately protected from juror prejudice by the jury selection process).

Second, Vitti argues that he was prejudiced by the extensive evidence the government presented against Gabriel. When a defendant fears this sort of prejudicial joinder, the defendant should move for severance under Fed.R.Crim.P. 14, and such a motion may be granted if the defendant would be "prejudiced" by the joinder. Here, Vitti did not move for a severance and he concedes that the district court would not have been required to grant him a severance if he had moved for one. Vitti is therefore left to argue that to combat prejudicial joinder, he has a right to a bench trial that somehow exceeds his right to a severance. However, Rule 14 specifically provides a mechanism to guard against the harm Vitti fears, and, furthermore, we see no potential prejudice here that would warrant granting a bench trial over the government's objection.

### B. *References to Air Safety*

■ The government presented evidence at trial that the bearing seal scheme and the LPT case scheme adversely affected air safety. On appeal, Vitti and Gabriel challenge the air safety evidence on two grounds—that it was irrelevant and that it was unfairly prejudicial. We review a district court's evidentiary rulings for an abuse of discretion. *See United States v. Salerno,* 868 F.2d 524, 538 (2d Cir.1989).

■ Defendants' relevancy argument has no merit. Defendants were charged with violating 18 U.S.C. § 1001[3] by making false statements to the FAA that certain airplane part repairs had been performed properly. Among the things the government was required to prove was that the false statements were material. *See id.; United States v. Gaudin,* 515 U.S. 506, 509, 115 S.Ct. 2310, 2313, 132 L.Ed.2d 444 (1995). To prove materiality, the government offered evidence that the improper repairs adversely affected

air safety. Evidence that air safety was adversely affected as a result of improper repairs is plainly relevant to proving the materiality of false statements that the repairs had been performed properly. Accordingly, we reject defendants' relevancy argument.

■ Defendants also contend that the district court admitted an excessive amount of air safety evidence at trial, and that the evidence unfairly played on the jurors' fear of flying. *See* Fed.R.Evid. 403. However, our review of the record indicates that defendants aggressively challenged the government's air safety evidence early and often. As the district court aptly stated when ruling on a similar argument:

> I am concerned that the defense is trying to have it two ways, to be blunt about it ... [the defense] wants me to take steps to narrow the Government's proof on materiality ... on the grounds of ... prejudice....
>
> I've taken steps in that direction, but I then begin to wonder whether the truth is being obscured when the defense on the one hand raises many, many defenses about materiality and yet suggests that the Government should be somewhat hamstrung in its ability to establish materiality beyond a reasonable doubt.

In light of defendants' decision to challenge materiality aggressively, we conclude that the district court did not abuse its discretion when it gave the government leeway to introduce air safety evidence.

■ Finally, defendants argue that they should receive a new trial based on prosecutorial misconduct because the prosecutor stated during closing argument that "no one in their right mind would put a loved one on an aircraft" that was using the LPT case that CRT had repaired. While the district court found that the reference to loved ones was improper, the court concluded that no "reasonable person could conclude that [the statement] had a material impact on this jury."

---

**3.** In October 1996, section 1001 was substantially amended. Because defendants were tried under a prior version of section 1001, we rely on that version.

■ We agree that the comment was improper. We have previously ruled that references to the jurors' personal safety are improper, *see United States v. Locascio*, 6 F.3d 924, 946 (2d Cir.1993), and we conclude that the reference to the safety of loved ones that the prosecutor made here is no different. However, we reverse a conviction for prosecutorial misconduct only if the misconduct deprived a defendant of a fair trial. *Id.* at 945. In evaluating a prosecutor's misconduct, we consider "(1) the severity of the ... misconduct; (2) the curative measures taken; and (3) the likelihood of conviction absent any misconduct." *Id.* at 945–46. We also agree with the district court that the prosecutor's comment did not deprive defendants of a fair trial. The statement was an isolated incident in an otherwise proper two hour argument that came at the conclusion of an otherwise fair six-week trial. Moreover, the district court's curative measures were strong as the district court instructed the jury that "considerations of air safety must not be a factor in your deliberation." Finally, the jury acquitted Vitti on all counts relating to the LPT case, indicating that the prosecutor's comments about the LPT case did not inflame the jury. *See id.* at 946 (jury's vote to acquit a defendant on one count indicated that jury was not influenced by improper comment).

## C. *Jury Instructions for the Mail and Wire Fraud Convictions*

The district court instructed the jury that to convict the defendants of mail fraud or wire fraud, the jury had to conclude that there was a scheme to defraud, that the defendants devised or participated in that scheme, that the defendants acted with an intent to defraud, and that the defendants used the mails or wires. Defendants challenge the district court's instruction on the element of intent to defraud, arguing that the court incorrectly defined both the necessary intent to harm and the concept of "conscious avoidance." Defendants concede that they did not raise these arguments below, and, therefore, they can prevail only if the district court's instructions constituted plain error. *See* Fed.R.Crim.P. 52(b).

■ An appellate court can reverse based on an argument not raised below if there is "(1) error, (2) that is plain, and (3) that affects substantial rights." *Johnson v. United States*, — U.S. —, —, 117 S.Ct. 1544, 1549, 137 L.Ed.2d 718 (1997) (quotations and internal alteration omitted); *see also United States v. Olano*, 507 U.S. 725, 732–35, 113 S.Ct. 1770, 1776–78, 123 L.Ed.2d 508 (1993). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Johnson*, — U.S. at —, 117 S.Ct. at 1549 (quotations and internal alterations omitted); *see also Olano*, 507 U.S. at 735–37, 113 S.Ct. at 1778–80. We consider defendants' arguments in light of this standard.

### 1. *Intent to Harm*

■ To establish mail fraud or wire fraud, the government must prove, *inter alia*, that the defendant acted with an intent to defraud. *See* 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud); *United States v. Dinome*, 86 F.3d 277, 283 (2d Cir.1996) (mail fraud and wire fraud). To establish an intent to defraud, the government must "prove that defendants contemplated some actual harm or injury to their victims. Only a showing of *intended harm* will satisfy the element of fraudulent intent." *United States v. Starr*, 816 F.2d 94, 98 (2d Cir.1987) (emphasis added and deleted); *see also In re The Seizure of All Funds in Accounts in the Names Registry Publishing*, 68 F.3d 577, 580 (2d Cir.1995) ("In order to establish that the defendant acted with an intent to defraud, the government must show that some actual harm or injury was *contemplated* by the schemer.") (internal quotation marks omitted); *United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir.1994); *Dinome*, 86 F.3d at 283.

Here, as to the intent to harm, the district court instructed the jury, in pertinent part, that

a defendant acts with a[n] ... intent to defraud if he participates in the fraudulent scheme with *some realization* of its fraud-

ulent or deceptive character and with *recognition* of its capacity to cause harm to the victims of such deception. The Government need not prove, however, that the intended victims were actually harmed, only that such harm was contemplated. (emphasis added).

Defendants argue that the quoted charge on intent to harm was insufficient. Defendants contend that because the instructions require only that they have "some realization" that the scheme was fraudulent and "recogni[ze]" that the scheme had the capacity to cause harm, the instructions did not require the jury to find that they intended to cause harm. We agree. Consider, for example, that Gabriel's secretary may have had "some realization" that a fraud was being perpetrated and may have "recogni[zed]" the fraud's capacity to cause harm. Nevertheless, the secretary may not have intended to cause harm.

Nor does the portion of the charge stating that the government must prove that "harm was *contemplated* " save the charge. "Contemplate" is subject to at least two possible meanings—it could mean "to think about" or it could mean "to have in view as a purpose . . . [to] intend." Webster's Third New International Dictionary 491 (1971) (capitalization altered). Our prior decisions have indicated repeatedly that a defendant must have "contemplated" harm, and when we have used that term, we have clearly meant the latter definition (to intend) rather than the former (to think about). *See, e.g., Starr,* 816 F.2d at 98 (government must "prove that defendants *contemplated* some actual harm or injury to their victims. Only a showing of *intended* harm will satisfy the element of fraudulent intent." (second emphasis added)); *Dinome,* 86 F.3d at 283–84 (indicating that "contemplated" harm is required and approving portion of jury instruction that stated that " 'Intent to defraud' means to act . . . with . . . the *purpose* of causing some financial or property loss to another" (emphasis omitted)). If the term "contemplate" was interpreted to mean "to think about," the term would be essentially synonymous with "to realize" or "to recognize"—and so understood, the term misstates the law (consider

that Gabriel's secretary may have thought about, but not intended, harm). We do not believe that a jury would interpret "contemplate" to mean "to think about" if the jury instructions otherwise made clear that defendants must have intended harm. Here, however, immediately before the instructions stated that the government must prove that defendants contemplated harm, the instructions stated that the government had to prove that defendant had "some realization" that the scheme was fraudulent and "recogni[zed]" that the scheme had the capacity to cause harm. The instructions therefore indicate to the jury that "contemplate" should be interpreted synonymously with "realize" or "recognize"—which is an error.

We therefore conclude that there was an error in the jury instructions. However, we need not decide whether the error was plain because we conclude that the error did not prejudice defendants. *See Olano,* 507 U.S. at 734–35, 113 S.Ct. at 1777–78 (whether an error affects substantial rights generally turns on whether the error was prejudicial). To have convicted defendants under the charge given by the district court, the jury must have concluded that there was a scheme to defraud, that defendants devised or participated in that scheme, and, under the district court's erroneous intent to defraud definition, that defendants realized that the scheme was fraudulent and recognized its capacity to cause harm. Having reached each of these conclusions, the jury necessarily would have concluded that defendants intended to cause harm. This is not a case like the innocent secretary example discussed above. Rather, both defendants were executive vice presidents at CRT and both participated as principals in the decisionmaking relating to their respective fraud convictions. As such, once the jury concluded that defendants were participating as principals in a fraudulent scheme that they realized was fraudulent and that they recognized could cause harm, the jury would have certainly concluded that defendants intended to cause harm. Accordingly, we conclude that the error in the instruction did not prejudice defendants.

### 2. Conscious Avoidance and Intent to Defraud

■ In addition to the district court's definition of intent to defraud, the district court also instructed the jury on the concept of "conscious avoidance." We have stated:

Conscious avoidance is a concept that deals most directly with knowledge. A conscious-avoidance instruction is appropriate when a defendant claims to lack some specific aspect of knowledge necessary to conviction but where the evidence may be construed as deliberate ignorance. Nonetheless, conscious avoidance is not irrelevant to intent; for knowledge is one component of intent. Without the knowledge, the intent cannot exist. Thus even in a . . . case[ ] in which specific intent must be proven, use of a conscious-avoidance instruction may be appropriate with respect to the defendant's knowledge of the objectives of the conspiracy[.] The same is true of mail fraud cases.

. . . .

. . . Thus, we would urge the trial court in each case to clarify for the jury . . . that the conscious-avoidance concept is pertinent to knowledge or sincerity of belief or to the knowledge component of intent, but that a finding of conscious avoidance could not alone provide the basis for finding purpose or for finding intent as a whole.

United States v. Beech–Nut Nutrition Corp., 871 F.2d 1181, 1195–96 (2d Cir.1989) (internal quotation marks and citations omitted).

Here, the district court instructed the jury, in pertinent part, that:

As with proof of the other states of mind, direct proof of fraudulent intent is not required. Fraudulent intent may be established by circumstantial evidence, based upon a person's outward manifestations, his words, his acts and all surrounding circumstances disclosed by the evidence and the inferences that may be drawn therefrom.

Inferences may also be drawn from a failure to act. For example, if you find that a defendant deliberately and purposely avoids learning obvious facts—if, as the saying goes, he puts his head in the sand to avoid seeing what is plainly to be seen—you may infer that he does so because he secretly knows that there is a high probability that what he will see if he does not deliberately turn away are facts that will give the lie to his own representations. From such circumstances . . . you may, if you wish, infer fraudulent intent.

Defendants argue that the last sentence in the second paragraph indicates to the jury that it may infer fraudulent intent from conscious avoidance, and that therefore, the district court erred in giving the instruction. See id. at 1196 ("a finding of conscious avoidance could not alone provide the basis for . . . finding intent"). In contrast, the government argues that the "circumstances" referred to in that sentence refer to all the circumstances, including those discussed in the first paragraph. The government argues that if the instruction is interpreted as it suggests, the instruction conveys the notion that conscious avoidance, along with other circumstances, is sufficient to infer intent. See id. (conscious avoidance is relevant to intent).

We assume, without deciding, that defendants are correct—that the instruction erroneously indicated to the jury that a finding of conscious avoidance was sufficient to infer intent. We nevertheless conclude that the error did not prejudice defendants.

Defendants do not challenge the district court's definition of conscious avoidance; rather, they simply contend that the court should have instructed the jury that conscious avoidance was sufficient to infer knowledge, but not intent. Therefore, assuming that the jury here relied on conscious avoidance to infer intent to defraud (which is the only way defendants could have been prejudiced by the instruction), it is fair to assume that if the jury had been properly instructed, it would have relied on conscious avoidance to infer the lesser mental state of knowledge of the fraud. If we combine a finding of knowledge of the fraud with the other findings this jury must have made to have convicted defendants, we see that if the jury had been properly instructed, it would have found that there was a scheme to defraud, that defendants participated in that

scheme, and that defendants knew that a fraud was being perpetrated. Having reached each of these conclusions, the jury necessarily would have concluded that defendants intended to defraud. As discussed above, this is not a case like our innocent secretary example. Rather, both defendants were executive vice presidents at CRT and both participated in the decisionmaking relating to their respective fraud convictions. As such, once the jury concluded that defendants were participating in a fraudulent scheme that they knew was fraudulent, the jury certainly would have found that defendants intended to defraud. Accordingly, we conclude that any error was not prejudicial.

D. *False Statements to the FAA Relating to the LPT Case Scheme—Aider and Abettor Liability*

Based on the false statement on the LPT case's packing slip (that the LPT case was serviceable), Gabriel was convicted of making a materially false statement within the jurisdiction of the FAA, in violation of 18 U.S.C. § 1001. Gabriel contends, and the government seemingly concedes, that there was no evidence that Gabriel prepared the slip himself.

■ Accordingly, to establish Gabriel's guilt, the government relied on 18 U.S.C. § 2(b),[4] which states: "Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal." As we have stated previously, the purpose of section 2(b) is to punish a person "who causes the doing of an act which if done by him directly would render him guilty of an offense against the United

States. It [establishes that one who] ... causes the commission of an indispensable element of the offense by an innocent agent ... is guilty as a principal." *United States v. Concepcion*, 983 F.2d 369, 383 (2d Cir. 1992) (quotation and emphasis omitted, and paragraph structure altered). Generally, to establish a conviction through the use of section 2(b), the government must prove that the defendant had the mental state necessary to violate the underlying criminal statute and that the defendant "willfully caused" another to commit the necessary act. *See* 18 U.S.C § 2(b).

■ On appeal, Gabriel challenges his conviction on two grounds. First, Gabriel contends that there was insufficient evidence to prove that he caused another to prepare the slip. Second, Gabriel contends that because section 2(b) requires a defendant to have acted "willfully," the jury should have been charged that it could convict Gabriel only if he knowingly violated the law.[5] We reject both arguments.

■ Gabriel's first argument is disposed of easily. By Gabriel's own admissions, he knew that CRT sent packing slips with repaired parts and that the packing slips contained a description of the work that CRT had performed. If the packing slip here stated the truth, that the LPT case was "irreparable scrap," the LPT case scheme quite obviously would have failed. Gabriel therefore had a strong incentive to ensure that the packing slip falsely stated that the LPT case was serviceable. Moreover, although Gabriel was in CRT's production department and the packing slip was prepared by quality control, there was overwhelming

---

**4.** Although section 2(a), which creates aider and abettor liability, can also be used to support a conviction when a defendant acts through intermediaries, under section 2(a) the aider and abettor must share the primary actor's criminal intent. *See United States v. Concepcion*, 983 F.2d 369, 383 (2d Cir.1992). Gabriel contends that there was no evidence that the person who filled out the slip had the requisite intent. Because the government never disputes Gabriel's contention, we assume that Gabriel is right. We consider in the text whether section 2(b) supports Gabriel's conviction.

**5.** The government contends that Gabriel waived the jury instruction argument by failing to raise it below. However, at the close of the case, Gabriel moved for a judgment of acquittal, arguing that section 2(b)'s use of the term "willfully" indicated that the government had to prove that he knowingly violated the law. The court denied Gabriel's motion, ruling that section 2(b) did not require a knowing violation of the law. Later, at the jury charging conference, Gabriel indicated that he had already argued the willfulness issue and that the court had ruled against him. It seems clear therefore that Gabriel sufficiently raised the jury instruction issue below.

evidence that the two were entangled. For example, when a CRT quality control inspector resisted approving the LPT case, Gabriel persuaded him to approve the case, stating to him that "[w]e can't all be pussies about this." Therefore, although no evidence directly indicates that Gabriel caused quality control to prepare the false packing slip, the jury could reasonably have concluded that Gabriel had some influence over quality control and that Gabriel used that influence to cause quality control to prepare the false slip.[6]

 Gabriel's more substantial argument is that under *Ratzlaf v. United States,* 510 U.S. 135, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994), the jury should have been charged that section 2(b)'s use of the term "willfully" means that the government was required to prove that Gabriel knowingly violated the law. In *Ratzlaf,* the Supreme Court held that the term "willfully," as used in 31 U.S.C. § 5322, established that the government was required to prove that a defendant knowingly violated the law. *Id.* at 136–37, 114 S.Ct. at 656–57. However, the Court did not hold that the government had to prove a knowing violation of the law every time a statute used the term "willful." Rather, the Court stated that "[w]illful ... is a word of many meanings, and its construction is often ... influenced by its context." *Id.* at 141, 114 S.Ct. at 659 (internal quotation marks and citation omitted). We therefore examine section 2(b)

below to determine what "willfully" means within that section.

Before we do so, however, we pause to discuss why we will not follow the approach taken by the Third Circuit in *United States v. Curran,* 20 F.3d 560 (3d Cir.1994). In *Curran,* the defendant was convicted of submitting false reports to the Federal Election Commission, in violation of 18 U.S.C. § 1001. *Id.* at 562. Although the government could not prove that the defendant prepared or submitted the false reports, the government could prove that the defendant caused others to do so. *Id.* at 563. Accordingly, the government used section 2(b) "[t]o bridge the gap." *Id.* at 567. On appeal, the issue was whether section 2(b)'s use of the term "willfully" established that the government was required to prove that the defendant knew his conduct was unlawful. *Id.* at 567–68.[7]

The court indicated that its "research has not revealed any controlling case law expounding on the proper construction of 'willfulness' required for a [jury] charge under section 2(b) linked with section 1001 in an Election Campaign Act case." *Id.* at 568. After discussing the Supreme Court's decision in *Ratzlaf,* the *Curran* Court stated that "similarities" between the *Ratzlaf* case and the case before it persuaded it that the government had to prove a knowing violation of the law under section 2(b). *Id.* at 568–69. Specifically, the court relied on the facts that (1) like the statutes in *Ratzlaf,* the election laws involved reporting obligations; (2) like

---

**6.** In his reply brief, Gabriel contends that there was insufficient evidence to prove that he knew that the packing slip would be retained in CRT's files. Because this argument was not raised in his initial brief (the initial brief mentions that Gabriel had no "responsibility for ... [the] retention" of packing slips, but never argues that there was no evidence that he knew the packing slip would be retained), the argument is waived. *See* Fed. R.App. P. 28(a)(6) (appellant's brief "must contain the contentions of the appellant on the issues presented"). Moreover, considering that Gabriel had over twenty years experience in the industry and was familiar generally with CRT's packing slips, the argument has no merit.

**7.** Although sections 1001 and 2(b) both contain a "willfully" element, the *Curran* Court's discussion makes clear that it was interpreting section 2(b)'s use of the term:

When proceeding under section 2(b) in tandem with section 1001, the government must prove that a defendant caused the intermediary to make false statements. The intent element differs from that needed when the prosecution proceeds directly under section 1001. The prosecution must not only show that a defendant had the requisite intent under section 1001 (deliberate action with knowledge that the statements were not true), but must also prove that he "willfully" caused the false representations to be made.

*"Willfulness" in this context is an important component of section 2(b),* and it is necessary that the term be understood.

*Id.* at 567–68 (emphasis added). The court then proceeded to discuss whether section 2(b)'s "willfully" component required a knowing violation of the law. *See id.* at 568–69.

the conduct at issue in *Ratzlaf,* the election law violations were not "obviously evil or inherently bad;" and (3) like the statutes at issue in *Ratzlaf,* the election laws were a regulatory scheme. *Id.* at 569. Accordingly, the court concluded that "a proper charge for willfulness in cases brought under sections 2(b) and 1001 in the federal election law context requires the prosecution to prove ... that [the defendant] knew his conduct was unlawful." *Id.*

In interpreting section 2(b), the court focused its attention almost exclusively on the federal election laws and explicitly limited its decision to "cases brought under · sections 2(b) and 1001 in the federal election law context"—indicating that in other contexts, the court might interpret section 2(b)'s "willfully" requirement differently. Therefore, as we understand the court's decision, if a defendant was prosecuted under sections 2(b) and 1001, whether section 2(b) required a knowing violation of the law would turn on the context in which the statement was made. Moreover, if a defendant was prosecuted under section 2(b) and a criminal section other than section 1001, whether section 2(b) required a knowing violation of the law would turn not only on the nature of the other section, but also on the context of the alleged violation of that section (the court did not limit its analysis to sections 2(b) and 1001, but moved on to consider the "context" in which the alleged violation occurred—the federal election laws).

Aside from the obvious interpretative difficulties that this approach would create, this sort of approach was rejected by the Supreme Court in *Ratzlaf.* The section at issue in *Ratzlaf,* 31 U.S.C. § 5322, makes it a crime to "willfully" violate a number of other sections. *Ratzlaf,* 510 U.S. at 136, 114 S.Ct. at 656–57. The issue before the *Ratzlaf* Court was whether section 5322's "willfully" element required the government to prove a knowing violation of the law when a person was accused of violating section 5324.[8] *Id.* at

136–37, 114 S.Ct. at 656–57. The Court noted that section 5322's "willfully" element had been consistently interpreted to require a knowing violation of the law as it applied to sections other than section 5324, and the Court stated: "A term appearing in several places in a statutory text is generally read the same way each time it appears. We have even stronger cause to construe a *single* formulation ... the same way each time it is called into play." *Id.* at 141–43, 114 S.Ct. at 659–60 (citations omitted). Accordingly, we conclude that however "willfully" is to be interpreted under section 2(b), it should be interpreted consistently.

We turn then to the task at hand, interpreting the "willfully" requirement of section 2(b), and conclude that the government need not prove a knowing violation of the law under that section. The principal reason for our conclusion is simple. The general rule in criminal cases is that the government need not prove a knowing violation of the law—we see no reason that Congress would change that rule simply because a person caused an innocent intermediary to act.[9] The most natural interpretation of section 2(b) is that a defendant with the mental state necessary to violate the underlying section is guilty of violating that section if he *intentionally* causes another to commit the requisite act. *See United States v. Hollis,* 971 F.2d 1441, 1451–52 (10th Cir.1992) (section 2(b) does not require a knowing violation of the law); *cf. United States v. Jordan,* 927 F.2d 53, 55 (2d Cir.1991) (under section 2(b), a defendant is "as liable for [a crime] as she would have been if she had physically [committed it herself]"); *American Surety Co. of New York v. Sullivan,* 7 F.2d 605, 606 (2d Cir.1925) (L.Hand, *J.*) ("The word 'willful' ... means no more than that the person charged with the duty knows what he is doing. It does not mean that, in addition, he must suppose that he is breaking the law.").

Moreover, the considerations that led the *Ratzlaf* Court to interpret "willfully" to re-

---

**8.** After *Ratzlaf,* Congress amended section 5322 and 5324 so that a knowing violation of the law is not required to establish that a defendant committed a crime by violating section 5324. *See* 31 U.S.C. §§ 5322(a)-(b), 5324(c).

**9.** We assume but need not decide that if the underlying statute requires a knowing violation of the law, the government would have to establish that element.

quire a knowing violation of the law under section 5322 are of little aid in interpreting section 2(b). The *Ratzlaf* Court indicated that if it did not interpret "willfully" to require a knowing violation of the law, the word would be mere surplusage. *See Ratzlaf,* 510 U.S. at 140–41, 114 S.Ct. at 658–59. Here, there is no such problem. If "willfully" is interpreted to mean "intentionally," it has a role to fill—the government must prove that defendant intentionally caused another to act. The *Ratzlaf* Court also was influenced by the "complex of provisions in which [section 5322 is] embedded." *Id.* at 141, 114 S.Ct. at 659; *see also Cheek v. United States,* 498 U.S. 192, 200–01, 111 S.Ct. 604, 609–10, 112 L.Ed.2d 617 (1991) (because the tax laws are so complex, their use of the term "willfully" indicates that a knowing violation of the law is required). Here, in contrast, section 2(b) is quite uncomplicated. The *Ratzlaf* Court's third reason was, as is discussed above, that the term had been consistently interpreted as requiring a knowing violation of the law in other contexts. *Ratzlaf,* 510 U.S. at 141–43, 114 S.Ct. at 659–60. Here, we could not find any binding precedent interpreting section 2(b)'s "willfully" requirement. Finally, the *Ratzlaf* Court stated that the conduct at issue was not "inevitably nefarious," and the Court gave some examples of occasions in which a person might engage in that conduct for legitimate reasons. *See id.* at 144–45, 114 S.Ct. at 660–61. That the conduct was not "inevitably nefarious" seemed to indicate to the Court that the term "willfully" should be interpreted to require a knowing violation of the law. *See id.* at 144–46, 114 S.Ct. at 660–62. Here, because a defendant will be convicted through section 2(b) only if the defendant had the mental state necessary to violate the underlying criminal statute, it is inevitable that the defendant had criminal intent.

Accordingly, we conclude that the government is not required to prove a knowing violation of the law under section 2(b).

### E. *Witness Tampering*

 As discussed above, even though a CRT inspector concluded that the LPT case

was unserviceable scrap after it had been repaired, Gabriel falsely represented to Qantas that the part was "100% serviceable." Eventually, the grand jury and CRT's investigators began to suspect that the repair work had been fraudulently performed. When CRT's investigators asked Gabriel about the repair, Gabriel falsely stated that he had previously disclosed the faults in the LPT case to Qantas. Further, in an attempt to support that story, Gabriel sent the fax to Donald Mealing, the Qantas representative with whom Gabriel had dealt, quoted earlier in this opinion.

Gabriel was convicted of violating 18 U.S.C. § 1512(b)(1), which makes it a crime to "corruptly persuade[ ] another person, or attempt[ ] to do so, or engage[ ] in misleading conduct toward another person, with intent to—influence ... the testimony of any person in an official proceeding." The government's theory was that Gabriel was attempting to mislead Mealing into believing that Gabriel had previously disclosed that the LPT case was only partially serviceable, and that Gabriel intended to have Mealing believe that lie and repeat it to the grand jury. *See United States v. Rodolitz,* 786 F.2d 77, 82 (2d Cir.1986) (section 1512(b) applies to "the situation where a defendant tells a potential witness a false story as if the story were true, intending that the witness believe the story and testify to it before the grand jury").[10]

On appeal, Gabriel contends, as he did unsuccessfully below, *United States v. Gabriel,* 920 F.Supp. 498, 500–02 (S.D.N.Y. 1996), that the government was required to prove that his actions were likely to affect Mealing's grand jury testimony. Gabriel further contends that because Mealing was in Australia and beyond the grand jury's subpoena power, there was insufficient evidence to prove that Mealing was likely to testify, and therefore, there was insufficient evidence to prove that Gabriel's actions were likely to affect Mealing's testimony. However, our decision in *United States v. Romero,* 54 F.3d 56 (2d Cir.1995), undercuts that argument.

---

**10.** Mealing eventually testified before the grand jury, and although the record is not clear on this point, it appears that Mealing was not fooled by Gabriel's misrepresentations.

In *Romero*, the defendant was convicted of violating 18 U.S.C. § 1512(a)(1)(C), *see id.* at 58, which makes it a crime to kill a person "with intent to—prevent the communication by any person to a law enforcement officer . . . of information relating to the commission or possible commission of a Federal offense." On appeal, we rejected the argument that the government had to prove that the victim "was willing to cooperate or that an investigation was underway." *Id.* at 62. Rather, we held that:

> The government need prove only an intent to kill for the purpose of interfering with communication with federal law enforcement officials. The victim need not have agreed to cooperate with any federal authority or even to have evinced an intention or desire to so cooperate. There need not be an ongoing investigation or even any intent to investigate. Rather, the killing of an individual with the intent to frustrate the individual's *possible cooperation* with federal authorities is implicated by the statute.

*Id.* (emphasis added); *see also id.* (intent to interfere with "potential communication" falls within section 1512(a)(1)(C)); *United States v. Kelley*, 36 F.3d 1118, 1128 (D.C.Cir.1994) (Section 1512(b) "requires that the jury be able reasonably to infer from the circumstances that [defendant], fearing that a grand jury proceeding had been or might be instituted, corruptly persuaded persons with the intent to influence their *possible testimony* in such a proceeding." (emphasis added)).

The elements of subsection (b)(1), which Gabriel was convicted of violating, are similar to the elements of subsection (a)(1)(C) that we construed in *Romero*. *Compare* 18 U.S.C § 1512(b)(1) *with* § 1512(a)(1)(C). Both sections make it illegal to engage in certain conduct (corruptly persuading/misleading or killing) with an intent to achieve a specified result (influencing testimony in an official proceeding or preventing the communication of crimes to federal authorities). Further, both sections serve the same basic purpose—the prevention of "[t]ampering with a witness . . . or an informant." *See id.* Accordingly, we base our interpretation of section 1512(b)(1) on our decision in *Romero*, and

conclude that the government was not required to prove that Mealing was likely to testify or that Gabriel's actions were likely to affect Mealing's testimony. Rather, the government was required to prove only that Gabriel endeavored corruptly to persuade or mislead Mealing with the intent of influencing Mealing's *potential* testimony before a grand jury.

Gabriel contends, nevertheless, that the Supreme Court's decision in *United States v. Aguilar*, 515 U.S. 593, 115 S.Ct. 2357, 132 L.Ed.2d 520 (1995), which was decided after we decided *Romero*, requires that a "likely to affect" requirement be incorporated into section 1512. In *Aguilar*, a grand jury was investigating the defendant, and when FBI agents questioned the defendant about his involvement in the subject of the grand jury's investigation, the defendant lied about that involvement. *Id.* at 597, 115 S.Ct. at 2361. For that lie, the defendant was convicted of violating the omnibus clause of 18 U.S.C. § 1503, which makes it a crime to "corruptly . . . endeavor[ ] to influence, obstruct, or impede, the due administration of justice." *Id.* at 598, 115 S.Ct. at 2361. As in this case, the government's theory in *Aguilar* was that the defendant lied to the FBI agents with the intent that the FBI agents would believe the lie and repeat it to the grand jury. *Id.* at 600, 115 S.Ct. at 2362.

Although the omnibus clause of section 1503 does not contain a "likely to affect" requirement, the Supreme Court nevertheless concluded that the government had to prove that the defendant's actions were likely to affect a judicial proceeding. *Id.* at 599–600, 115 S.Ct. at 2362. Because there was no evidence that the FBI agents were to testify before the grand jury, the Court concluded that there was insufficient evidence to establish that the defendant's actions were likely to affect a judicial proceeding. *Id.* The Court therefore affirmed the decision of the Court of Appeals to the extent that it reversed the conviction under section 1503.

Although the facts in this case and in *Aguilar* are similar—each defendant was convicted for telling a lie to a potential witness with the intent that the witness would believe the lie and repeat it to a grand jury—

that is where the similarity between these two cases ends. A comparison of the statutes that underlie the convictions demonstrates that the "likely to affect" requirement that the *Aguilar* Court incorporated into section 1503 should not be incorporated into section 1512.

As mentioned above, the omnibus clause of section 1503 makes it a crime to "corruptly ... endeavor[ ] to influence, obstruct, or impede, the due administration of justice." The *Aguilar* Court plainly was concerned about the "very broad language" of this clause. *Id.* at 599, 115 S.Ct. at 2362. Further, the Court indicated that without a "likely to affect" requirement, the provision would not provide "fair warning ... to the world ... of what the law intends to do if a certain line is passed." *Id.* at 599–600, 115 S.Ct. at 2362 (citation omitted); *see also United States v. Wood,* 6 F.3d 692, 695–96 (10th Cir.1993) (a "natural and probable effect" requirement was "necessary ... because particular acts, although arguably interfering with some aspect of the administration of justice, may be beyond the scope of § 1503 because the nexus ... is too attenuated and the statutory construction ... too strained" (internal quotation marks and citation omitted)). Accordingly, the *Aguilar* Court incorporated a "likely to affect" requirement into section 1503. *Aguilar,* 515 U.S. at 599, 115 S.Ct. at 2362.

Here, unlike the omnibus clause of section 1503, section 1512(b) uses language that provides fair notice to the world of what line cannot be crossed. Section 1512(b) has two elements that are germane to the offenses charged: (1) that the defendant engaged in misleading conduct or corruptly persuaded a person, and (2) that the defendant acted with an intent to influence the person's testimony at an official proceeding. *See* 18 U.S.C. § 1512(b)(1). Both of the alternative possibilities in the first element provide fair notice—"misleading conduct" is defined with particularity in a later section, *see id.*

§ 1515(a)(3), and we previously have held that "corruptly persuade" is not unduly vague, *see United States v. Thompson,* 76 F.3d 442, 452 (2d Cir.1996).[11] Further, the second element, intent to influence a person's testimony at an official proceeding, is also reasonably specific. Accordingly, there is no reason to narrow section 1512(b) by incorporating a "likely to affect" requirement as the *Aguilar* Court did to section 1503.

Moreover, the *Aguilar* Court held that the "likely to affect" requirement was not satisfied by making a false statement to a potential witness who *might* testify before a grand jury that was *already* impaneled and investigating Aguilar. *Aguilar,* 515 U.S. at 600–01, 115 S.Ct. at 2362–63. It stands to reason, therefore, that uttering a false statement to a person who *might* testify before a grand jury that *might* be impaneled would not satisfy the "likely to affect" requirement either. Therefore, if a "likely to affect" requirement were incorporated into section 1512(b), an official proceeding would have to be pending at the time of the defendant's conduct to warrant a conviction. However, section 1512(e)(1) specifically provides that "an official proceeding need not be pending or about to be instituted at the time of the offense." Therefore, if a "likely to affect" requirement were incorporated into section 1512(b), it would create a direct conflict with section 1512(e)(1)—indicating that a "likely to affect" requirement should not be incorporated into section 1512(b).

Finally, Gabriel's basic argument—that section 1512 and the omnibus clause of section 1503 are closely related,[12] and that therefore, the omnibus clause's "likely to affect" requirement should be incorporated into section 1512—would seem to require incorporating the "likely to affect" requirement into other sections that are also closely related to the omnibus clause. This would require incorporating a "likely to affect" re-

---

**11.** *But see Aguilar,* 515 U.S. at 600 & n. 1, 115 S.Ct. at 2362 & n. 1 (declining to decide whether section 1503's use of the term "corruptly" renders the section vague or overbroad).

**12.** Although the sections are closely related, we have concluded that if the government seeks to prosecute a person for witness tampering, the

government cannot use section 1503 but must instead use section 1512. *See United States v. Masterpol,* 940 F.2d 760, 762–63 (2d Cir.1991). The *Aguilar* Court declined to decide this issue. *Aguilar,* 515 U.S. at 600 & n. 1, 115 S.Ct. at 2362 & n. 1.

quirement into numerous other sections which are also designed to protect the due administration of justice. *See, e.g.,* 18 U.S.C. §§ 1501–1514. Incorporating a "likely to affect" requirement into these sections would work a major and unwarranted overhaul of the statutory scheme.

Accordingly, despite the factual similarity between this case and *Aguilar,* we conclude that the government was not required to prove that Gabriel's actions were "likely to affect" Mealing's testimony before the grand jury. Rather, the government was required to prove only that Gabriel misled or corruptly persuaded Mealing with the intent to interfere with Mealing's *potential* testimony before the grand jury. *See Romero,* 54 F.3d at 62.

Here, the jury reasonably could conclude that Gabriel acted with the requisite intent. Gabriel concedes that he sent the fax to Mealing with the intent to interfere with CRT's internal investigation, but Gabriel argues that the fax would not support an inference that he intended to interfere with the grand jury investigation. From the body of the fax, the jury reasonably could have concluded that Gabriel's sole intention was to interfere with CRT's investigators. If the jury had so concluded, it would have been compelled to find Gabriel innocent because section 1512(b)(1) prohibits interference only with official proceedings. *See United States v. Shively,* 927 F.2d 804, 811 (5th Cir.1991). However, the jury also reasonably could have concluded that Gabriel intended to interfere with the grand jury investigation. Gabriel knew that there was an ongoing grand jury investigation at the time he sent the fax and Gabriel knew that Mealing could be a damaging witness. Further, although the body of the fax discussed only the CRT investigation, the fax was headed "ONGOING GOVT IN-VESTIGATION AT CRT." From these facts,

the jury reasonably could have concluded that Gabriel sent the fax with the intent, at least in part, of interfering with Mealing's potential testimony before the grand jury.[13]

## F. *Retroactive Misjoinder*

■■■■■ Gabriel contends that his conviction for making false statements on a document relating to the bearing seal scheme was tainted by "retroactive misjoinder." "Retroactive misjoinder arises where joinder of multiple counts was proper initially, but later developments—such as a district court's dismissal of some counts for lack of evidence or an appellate court's reversal of less than all convictions—renders the initial joinder improper." *United States v. Vebeliunas,* 76 F.3d 1283, 1293 (2d Cir.) (internal quotation marks and citations omitted), *cert. denied,* —— U.S. ——, 117 S.Ct. 362, 136 L.Ed.2d 253 (1996). Here, because each of Gabriel's convictions has been affirmed, his retroactive misjoinder argument is moot.

## G. *Gabriel's Sentencing*

### 1. *Trial Perjury*

■■■■ At sentencing, the district court increased Gabriel's offense level by two for committing perjury at trial. We have held that for sentencing purposes, trial perjury must be found by clear and convincing evidence. *United States v. Onumonu,* 999 F.2d 43, 45 (2d Cir.1993). Here, the district court stated that although "I would not have concluded that [Gabriel] perjured himself beyond a reasonable doubt, on a preponderance standard, I would have to conclude that he had." Gabriel argues, and the government concedes, that the case should be remanded for the court to consider whether Gabriel committed trial perjury by clear and convincing evidence. We agree that resentencing is required on this issue.[14]

---

**13.** We note that although not argued by Gabriel, the jury also reasonably could have concluded that Gabriel's sole intent was to interfere with the FBI investigation, and if the jury had so concluded, it would have been compelled to find Gabriel innocent. *See* 18 U.S.C. § 1512(b)(1) (prohibiting only interference with "official proceeding[s]"); *id.* § 1515(a)(1) (defining "official proceeding" and not including government investigations). However, the jury reasonably

could have concluded that Gabriel was more concerned about the grand jury investigation, and that therefore, Gabriel acted, at least in part, to interfere with that investigation.

**14.** At sentencing, the district court determined the offense level for Gabriel's fraud and false statement convictions, and then added two offense levels for Gabriel's obstruction of justice conviction (witness tampering), *see* Guidelines

## 2. *Restitution*

At sentencing, the district court ordered Gabriel to pay the cost to repair the LPT case, $35,628, to Qantas or to any person who paid Qantas for the cost of that repair. CRT paid Qantas, and, therefore, the district court's order required Gabriel to repay CRT.

On appeal, Gabriel and the government dispute whether Gabriel can be forced to repay CRT under 18 U.S.C. § 3663(e)(1). However, in the Mandatory Victims Restitution Act of 1996 (MVRA), Congress repealed section 3663(e)(1) and enacted or amended numerous other sections relating to victim restitution. *See* MVRA, Pub.L. No. 104–132, §§ 201–211, 110 Stat. 1214, 1227–1241 (codified at 18 U.S.C. §§ 3611–3613A, 3663–3664). The MVRA states that it "shall, to the extent constitutionally permissible, be effective for sentencing proceedings in cases in which the defendant is convicted on or after the date of enactment of this Act." MVRA, Pub.L. No. 104–132, § 211, 110 Stat. 1241. The MVRA was enacted on April 24, 1996, about two weeks before Gabriel was convicted, and therefore, the MVRA was in effect for Gabriel's sentencing to the extent constitutionally permissible. Because the parties have not addressed the MVRA on appeal, we remand for the district court to reconsider issues relating to ordering Gabriel to make restitution. *See United States v. Malpeso,* 126 F.3d 92 (2d Cir.1997).

## 3. *$500,000 Fine*

■ Finally, the district court *sua sponte* departed upward from the Guidelines' fine range and imposed a $500,000 fine on Gabriel. Gabriel contends, and the government concedes, that the fine should be vacated and that he should be resentenced because he did not receive notice that the district court was going to depart upward. *See* Fed.R.Crim.P. 32(c)(3)(A)-(C); *United States v. Sisti,* 91 F.3d 305, 310 (2d Cir.1996) (under Rule 32, a defendant must be provided with notice before a court can depart upwards); *Burns v. United States,* 501 U.S. 129, 135–38, 111 S.Ct. 2182, 2185–97, 115 L.Ed.2d 123 (1991). We agree that resentencing is required on this point.

## CONCLUSION

We affirm Gabriel's and Vitti's convictions. We remand for the district court to reconsider several issues relating to Gabriel's sentence.

---

§ 3C1.1 n. 6. The court then determined that Gabriel had committed trial perjury (unrelated to the obstruction of justice conviction), and the court therefore added two offense levels as a "departure or adjustment" for that perjury.

On appeal, the parties dispute whether the court actually made a departure or an adjustment, and whether it was permissible under the Guidelines to make either. As we are remanding the case for resentencing on the perjury enhancement, the question of what the district court actually did is moot. As to whether the Guidelines permit either a departure or an adjustment in this circumstance, we will leave that question unanswered until we have to decide it. We note for the United States Sentencing Commission, however, that Guidelines § 3C1.1 n. 6 could be made more clear as to whether, when a defendant has been convicted of an underlying offense, there can be a two-level adjustment for an obstruction of justice conviction and another two-level adjustment for a "significant further obstruction" such as trial perjury.