17-343-cr
*United States v. Sampson*

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term 2017

(Argued: December 7, 2017          Decided: August 6, 2018)

No. 17-343-cr

_____

UNITED STATES OF AMERICA,

*Appellee,*

-v.-

JOHN SAMPSON,

*Defendant-Appellant.*

_____

Before:      CABRANES, LIVINGSTON, and CARNEY, *Circuit Judges.*

Defendant-Appellant John Sampson ("Sampson") appeals from a January 27, 2017 judgment of the United States District Court for the Eastern District of New York (Irizarry, *C.J.*), following a jury verdict finding him guilty of obstruction of justice and making false statements to federal agents. On appeal, Sampson argues that: (1) the government prosecuted him improperly for a "witness-tampering" offense under 18 U.S.C. § 1503(a); (2) the district court committed reversible error in its jury instruction concerning whether he "willfully caus[ed]" an obstruction of justice under 18 U.S.C. § 2(b); (3) the evidence was insufficient to support his conviction for making a false statement in violation of 18 U.S.C.

1

§ 1001(a)(2); (4) the district court committed reversible error (and violated Sampson's Confrontation Clause rights) by preventing Sampson from introducing an FBI agent's notes into evidence, and by sustaining the prosecution's objection to a question that Sampson's counsel asked at trial; (5) the district court unfairly prejudiced Sampson by allowing the prosecution to introduce evidence of bribes that he allegedly received; and (6) the sentence imposed by the district court was unreasonable. We have examined each of Sampson's arguments and conclude that none of them have merit. The district court's judgment of conviction is therefore **AFFIRMED**.

FOR DEFENDANT-APPELLANT:    NATHANIEL H. AKERMAN (Joshua Colangelo-Bryan, *on the brief*), Dorsey & Whitney, New York, NY.

FOR APPELLEE:    PAUL TUCHMANN, Assistant United States Attorney (David C. James, Alexander A. Solomon, and Marisa M. Seifan, Assistant United States Attorneys, *on the brief*), *for* Richard P. Donoghue, United States Attorney for the Eastern District of New York, Brooklyn, NY.

DEBRA ANN LIVINGSTON, *Circuit Judge*:

On July 24, 2015, following a jury trial in the United States District Court for the Eastern District of New York (Irizarry, *C.J.*), Defendant-Appellant John Sampson ("Sampson") was convicted of one count of obstruction of justice, in violation of 18 U.S.C. § 1503(a), and two counts of making false statements to federal agents, in violation of 18 U.S.C. § 1001(a)(2). The district court later sentenced Sampson principally to five years of imprisonment. On appeal,

2

Sampson challenges the judgment on numerous grounds. We conclude that none of Sampson's arguments is meritorious. We therefore **AFFIRM** the district court's judgment of conviction.

## BACKGROUND

### I. Factual Background[1]

Sampson began serving in the New York State Senate in 1997, representing the 19th Senate District in Brooklyn. Until his expulsion from the Senate in 2015, Sampson was seen as a political "powerhouse." *See* Alan Feuer, *John Sampson, Once a State Senate Powerhouse, Sentenced to Prison*, N.Y. Times, Jan. 19, 2017, at A20. He served as leader of the Democratic Conference of the Senate from June 2009 to December 2012, and Minority Leader of the Senate from January 2011 to December 2012.

Sampson was also licensed to practice law in New York State. As described in more detail in this case's companion appeal, *United States v. Sampson*, No. 15-2869-cr (2d Cir. 2018), Justices of the New York State Supreme Court periodically appointed Sampson to serve as a referee in foreclosure actions for properties

---

[1] Because Sampson is appealing a judgment of conviction entered after a jury trial, unless otherwise noted, the factual background presented here is drawn from the evidence presented at trial and is described in the light most favorable to the government. *See United States v. Silver*, 864 F.3d 102, 106 n.4 (2d Cir. 2017).

located in Brooklyn. The government argued at trial that over time, Sampson embezzled hundreds of thousands of dollars from various foreclosure escrow accounts that he oversaw as a referee.

In July 2006, Sampson asked Edul Ahmad ("Ahmad"), a Queens businessman, to lend him $188,500 so that he could replace funds he had embezzled before the authorities could discover they were missing. Ahmad agreed to lend Sampson the money. Sampson failed to repay Ahmad. After realizing that Sampson would not repay the loan, Ahmad asked Sampson to use his position in the New York State Senate to provide Ahmad with special favors. Sampson subsequently intervened with New York State regulatory agencies conducting reviews of Ahmad's business, lobbied for Ahmad to receive potentially lucrative brokerships from national financial institutions, and introduced legislation that would have benefited Ahmad as the owner of a minority-owned business.

In July 2011, Federal Bureau of Investigation ("FBI") agents arrested Ahmad for mortgage fraud, and the United States Attorney's Office for the Eastern District of New York ("the USAO") commenced its prosecution of Ahmad. After Ahmad was released on bail, he met with Sampson "multiple times." App'x at 109.

4

Sampson told Ahmad that Sampson "had a friend that he had gone to school with" who worked in the USAO, "and that he would reach out to this individual and try to get some information as to the strength of [the USAO's] case," including the names of individuals who might testify against Ahmad should Ahmad choose to go to trial. *Id.* at 110. The government argued to the jury that Sampson's goal was to prevent Ahmad from pleading guilty to the charges, cooperating with the government, and disclosing Sampson's crimes. Ahmad accepted Sampson's offer to help him acquire names of potential witnesses.

Sampson contacted Samuel Noel ("Noel"), who, at the time, served as a supervisory paralegal at the USAO. Sampson provided Noel with the names of four potential witnesses in Ahmad's case: Leesa Shapiro, Glenn Hirsch, Roger Khan ("Khan"), and Premaj Hansraj ("Hansraj"). Noel understood that Sampson was asking him to conduct an improper search of the USAO's non-public database and determine who was planning to testify at Ahmad's trial. Noel knew that it was a crime for him to provide Sampson with this non-public information.

Nonetheless, after speaking with Sampson, Noel used his government account to run the names of Ahmad, Sampson, and the relevant witnesses through the Public Access to Electronic Records ("PACER") database. Noel understood at

the time that he was forbidden from using PACER for such non-work-related purposes. Next, Noel looked up the names of Ahmad, Sampson, and the relevant witnesses in the Legal Information Office Network System ("LIONS"), a non-public USAO database with confidential information.[2] Noel found results for Ahmad, Khan, and Hansraj, but not for the others. Noel later told Sampson that he did not see his name or come across other relevant information in the LIONS database.

Noel also contacted two nonsupervisory USAO paralegals, one working on Ahmad's case and the other working in the USAO's public integrity section. During a closed-door meeting, Noel told the paralegal working on Ahmad's case to inform him of information regarding the case, including if she learned that witnesses were speaking about Sampson. During another closed-door meeting in his office, Noel directed the paralegal working in the public integrity section to inform him if she came across any of the named witnesses mentioning Sampson. On November 22, 2011, Sampson assured Ahmad that Sampson was "on top of"

---

[2] Noel testified that he looked up Sampson's name "[t]o see if he might have been a target, to see if he was being investigated." App'x at 745.

Noel, and that Noel was "doing the best he can" to find out information on Ahmad's case. *Id.* at 914.

Ahmad also informed Sampson that the FBI had approached Qayaam Farrouq ("Farrouq"), one of Ahmad's co-conspirators in the mortgage fraud. Ahmad told Sampson that he was worried that Farrouq would cooperate with the government. Ahmad therefore suggested that Sampson provide Farrouq with an attorney who would betray attorney-client confidentiality and provide them with information about whether Farrouq would cooperate. Sampson arranged for an attorney to represent Farrouq, instructing Ahmad not to have contact with the attorney directly, but that Sampson himself would communicate with the attorney about Farrouq.

Sampson followed a similar tack after the government arrested Nazir Gurmohamed ("Gurmohamed"), one of Ahmad's other co-conspirators. Sampson suggested that he and Ahmad obtain an attorney for Gurmohamed who would breach privilege and inform them if Gurmohamed began cooperating with the government. During the meeting with Ahmad at which this conversation took place, Sampson talked to Farrouq's attorney on the phone and solicited information about Farrouq and Gurmohamed's arraignments and bail hearings.

7

As for obtaining a lawyer for Gurmohamed, Sampson instructed Ahmad to pay the attorney in cash so there would be no "money trail." *Id.* at 923. Later, Sampson sent Ahmad contact information for the attorney Ahmad was to retain for Gurmohamed.

Sampson also attempted to hire a private investigator, Warren Flagg ("Flagg"), a former FBI agent who worked with the USAO while in that role. Sampson hoped that Flagg could exploit his ties with the USAO to extract information regarding the case against Ahmad. During a meeting, Flagg told Ahmad that it would be illegal for him to secure confidential information about the USAO's potential cooperating witnesses. *See id.* at 1010 ("[I]f I call up a buddy of mine and say, oh, you know this case? First of all, that's tampering."). Nevertheless, Flagg suggested that Ahmad compile a list of possible cooperating witnesses for Flagg to investigate. Sampson repeatedly urged Ahmad to do so. At the same time, Sampson stated that Ahmad did not need to involve his criminal counsel in any of Flagg's potential work.

Despite Sampson's efforts, Ahmad began to cooperate with the government in November 2011. Sampson and Ahmad met again in February 2012. In preparation for the meeting, pursuant to instructions from law enforcement,

8

Ahmad copied a page from his check register that showed the $188,500 he had transferred to Sampson. During the meeting, Ahmad showed Sampson the copy, informed him that it was responsive to a government subpoena, and asked what he should do. Sampson instructed Ahmad not to produce the check register and to lie to the government about its—and the loan's—existence. Sampson then took the copy from Ahmad; he did not return it.

On July 27, 2012, two FBI agents—Ken Hosey ("Agent Hosey") and Erin Zacher ("Agent Zacher")—interviewed Sampson and questioned him about the check register page. Sampson claimed not to recall anything about the $188,500 payment that Ahmad had provided him. Agent Hosey then showed Sampson a photocopy of Ahmad's check register page. Sampson told Hosey that the document "didn't ring a bell" and that "he didn't have a recollection from it." *Id.* at 780. He suggested, however, that he might recall if he checked his files or received more information.

In the same interview, the agents questioned Sampson about his ownership interest in a Brooklyn liquor store. Sampson had previously failed to disclose this interest when submitting a liquor license application to the New York State Liquor Authority. Responding to FBI questioning, however, Sampson admitted he did

have the ownership interest. He claimed that his four business partners in the store awarded him the interest as payment for performing certain legal work, but Sampson failed to identify what work he did. He also denied asking one of his Senate staffers to help with a matter related to the store.

At the conclusion of the interview, Hosey informed Sampson that he believed Sampson was lying and that it was a felony to lie to federal agents. Sampson responded, "[n]ot everything I told you was false." Trial Transcript ("T.") 2109.

## II. Procedural History

On April 29, 2013, a grand jury in the United States District Court for the Eastern District of New York returned an indictment against Sampson that contained nine criminal counts. On March 17, 2015, a grand jury returned a fifth superseding indictment, which contained eleven counts. [3] Counts 1 and 2 concerned Sampson's alleged embezzlements from the escrow accounts that he

---

[3] The grand jury later returned a sixth superseding indictment, under which Sampson was tried. Sampson's judgment of conviction, however, refers to the substantive counts of the *fifth* superseding indictment. Sampson concedes that the two indictments contain identical counts apart from the two embezzlement counts that, as noted below, the district court dismissed pretrial. Sampson's brief on appeal therefore cites exclusively to the fifth superseding indictment, and for the sake of consistency, we will as well.

oversaw as a referee.[4] Count 3 charged Sampson with conspiracy to obstruct justice, in violation of 18 U.S.C. § 1512(k), due to his alleged efforts—with Noel, Ahmad, and others—to impede Ahmad's mortgage fraud investigation. Count 4 charged Sampson with obstruction of justice, in violation of 18 U.S.C. § 1503(a), for his individual role in the same conduct. Count 5 charged Sampson with witness tampering, in violation of 18 U.S.C. §§ 1512(b)(2)(A)–(C) and 1512(b)(3), for attempting to induce Ahmad not to provide the check register page to the federal authorities. Count 6 charged Sampson with witness tampering, in violation of 18 U.S.C. § 1512(b)(3), for pressuring Ahmad to lie to the government about the existence of the $188,500 loan. Count 7 charged Sampson with evidence tampering, in violation of 18 U.S.C. § 1512(c)(1), for his attempt to hide the check register page from the government. Count 8 charged Sampson with concealment of records, in violation of 18 U.S.C. § 1519, regarding the same conduct. Finally, Counts 9, 10, and 11 charged Sampson with making false statements to federal officers, in violation of 18 U.S.C. § 1001(a)(2). Specifically, the indictment alleged that Sampson falsely told Agents Hosey and Zacher that he did not recall seeing the

---

[4] The district court later dismissed those counts as time-barred. In this case's companion appeal, we vacated the district court's decision and reinstated the two counts. *See United States v. Sampson*, No. 15-2869-cr (2d Cir. 2018).

check register page prior to the FBI interview (Count 9), that he never requested nonpublic information from Noel (Count 10), and that he did not direct a Senate staffer to intervene with New York tax authorities on the liquor store's behalf (Count 11).

A jury trial commenced on June 22, 2015. On July 24, 2015, the jury found Sampson guilty as to Counts 4, 9, and 11. In other words, the jury concluded that Sampson personally obstructed justice in the mortgage fraud investigation and made false statements to Agents Hosey and Zacher regarding his knowledge of the check register page and his use of Senate staff to benefit the liquor store.

On September 14, 2015, Sampson moved for judgments of acquittal on Counts 4 and 9 (but not Count 11) pursuant to Federal Rule of Criminal Procedure 29. *See United States v. Sampson*, No. 13-cr-269 (DLI), 2016 WL 756565, at *1 (E.D.N.Y. Feb. 26, 2016) ("*Sampson* 2016").[5] Sampson argued that the § 1503(a) obstruction conviction (*i.e.*, Count 4) was invalid because it was based solely on conduct that amounted to witness tampering. The district court held that Sampson waived this argument by failing to raise it before trial and that, in any event,

---

[5] The district court's opinion refers to these counts as Counts 2, 7, and 9, which is how they are referenced in the sixth superseding indictment.

Sampson's argument failed on the merits. *See id.* at *9–13. Sampson also claimed that the check register false statement conviction (*i.e.*, Count 9) was invalid because, *inter alia*, it was literally true that he had not seen the FBI's photocopy of the check register page prior to the interview. The district court rejected this argument, noting that "*[o]f course* Special Agent Hosey was not asking if Defendant literally had ever seen the actual photocopy then being displayed; Special Agent Hosey was asking if Sampson had ever seen the image depicted therein." *Id.* at *17 (emphasis in original).

In addition, on July 5, 2016, Sampson moved for a new trial due to the Supreme Court's decision in *McDonnell v. United States*, 136 S. Ct. 2355 (2016). The district court denied this request, concluding that *McDonnell* was inapplicable because the government had not charged Sampson with bribery or corruption offenses.

On January 18, 2017, the district court sentenced Sampson to five years of imprisonment on each of the three counts, with the sentences to run concurrently, followed by three years of supervised release. The district court entered judgment

on January 27, 2017, and Sampson timely appealed. Sampson is presently serving his sentence.

## DISCUSSION

### I

Sampson first argues that the government's theory of obstruction under 18 U.S.C. § 1503(a)—*i.e.*, that Sampson sought confidential information in Ahmad's case with the corrupt intent of facilitating witness tampering—ran afoul of our decisions in *United States v. Hernandez*, 730 F.2d 895 (2d Cir. 1984), and *United States v. Masterpol*, 940 F.2d 760 (2d Cir. 1991). Accordingly, he contends, his conviction on Count 4 must be vacated. The government counters that Sampson waived this objection by not raising it before trial and, in any event, Sampson's conduct was properly punishable under § 1503(a).

Because Sampson's argument raises questions of law, our review is *de novo*. *See United States v. Holcombe*, 883 F.3d 12, 15 (2d Cir. 2018). We need not address whether Sampson waived this argument, because even assuming *arguendo* that he did not, we conclude—for the reasons outlined below—that § 1503(a) proscribed his conduct. In doing so, we narrow the potential reach of some of our language in *Hernandez* and *Masterpol*—cases whose reasoning "has been rejected by every

14

other federal court of appeals that has considered the issue," *United States v. Bruno*, 383 F.3d 65, 87 (2d Cir. 2004).[6]

**A. Overview of 18 U.S.C. § 1503(a) and 18 U.S.C. § 1512**

Section 1503(a) of Title 18 criminalizes, *inter alia*, endeavoring to intimidate, threaten, or injure court officers, commissioners, and jurors. It also contains a residual or "omnibus" clause. *See, e.g.*, *United States v. Aguilar*, 515 U.S. 593, 598 (1995) (describing § 1503(a)'s structure). This "omnibus" clause broadly prohibits, *inter alia*, "corruptly . . . endeavor[ing] to influence, obstruct, or impede, the due administration of justice." 18 U.S.C. § 1503(a); *see also United States v. Kumar*, 617 F.3d 612, 620 (2d Cir. 2010) ("[T]he omnibus clause embraces the widest variety of conduct that impedes the judicial process[.]" (internal quotation marks and citation omitted)). The conduct that the omnibus clause proscribes consists of an *actus reus* and a *mens rea*. The *actus reus* is "endeavor[ing] to influence, obstruct, or impede, the due administration of justice." 18 U.S.C. § 1503(a).[7] The *mens rea* is

---

[6] *See, e.g.*, *United States v. Davis*, 854 F.3d 1276, 1289 (11th Cir. 2017); *United States v. LeMoure*, 474 F.3d 37, 40–41 & n.2 (1st Cir. 2007); *United States v. Ladum*, 141 F.3d 1328, 1337–38 (9th Cir. 1998); *United States v. Tackett*, 113 F.3d 603, 606–11 (6th Cir. 1997); *United States v. Maloney*, 71 F.3d 645, 659 (7th Cir. 1995); *United States v. Kenny*, 973 F.2d 339, 343 (4th Cir. 1992); *United States v. Branch*, 850 F.2d 1080, 1082 (5th Cir. 1988); *United States v. Risken*, 788 F.2d 1361, 1369 (8th Cir. 1986).

[7] In the context of § 1503(a), an "endeavor" is simply "act[ing] with the wrongful intent or improper purpose to influence [a] judicial or grand jury proceeding," and doing

acting "corruptly," *id.*—that is, with "a specific intent to obstruct a federal judicial or grand jury proceeding." *United States v. Schwarz*, 283 F.3d 76, 109 (2d Cir. 2002). Accordingly,

> to convict for obstruction of justice under the omnibus clause of section 1503, the government must establish (1) that there is a pending judicial or grand jury proceeding constituting the administration of justice, (2) that the defendant knew or had notice of the proceeding, and (3) that the defendant acted with the wrongful intent or improper purpose to influence the judicial or grand jury proceeding, whether or not the defendant is successful in doing so—that is, "that the defendant corruptly intended to impede the administration of that judicial proceeding."

*United States v. Quattrone*, 441 F.3d 153, 170 (2d Cir. 2006) (quoting *United States v. Fassnacht*, 332 F.3d 440, 447 (7th Cir. 2003)). The government must show, we have said, that the defendant's conduct "ha[d] the natural and probable effect of interfering with a judicial or grand jury proceeding." *Id.* at 171.

Before 1982, § 1503 also explicitly criminalized endeavoring to intimidate, threaten, or injure witnesses. *See Hernandez*, 730 F.2d at 898–99. In 1982, however,

---

so in a manner that has the "natural and probable effect of" succeeding. *United States v. Quattrone*, 441 F.3d 153, 170–171 (2d Cir. 2006); *see also United States v. Russell*, 255 U.S. 138, 143 (1921) (defining an "endeavor" under § 1503 as "*any effort or essay* to do or accomplish the evil purpose that the section was enacted to prevent" (emphasis added)). By using the term "endeavor" in § 1503(a), Congress intended to remove "the technicalities associated with distinguishing between preparation for an attempt and the attempt itself." *United States v. Buffalano*, 727 F.2d 50, 53 (2d Cir. 1984).

16

Congress passed the Victim and Witness Protection Act, Pub. L. No. 97-291, 96 Stat. 1248 (1982), which was designed to "strengthen existing legal protections for victims and witnesses of federal crimes." *Hernandez*, 730 F.2d at 898 (quoting S. Rep. No. 532, 97th Cong., 2d Sess. 9). The Act eliminated all explicit references to witnesses in § 1503 and created a new statute—18 U.S.C. § 1512—which broadly criminalizes various forms of witness tampering. *See id*. Section 1512, as relevant here, criminalizes "knowingly us[ing] intimidation, threaten[ing], or corruptly persuad[ing]" a witness with intent to delay or prevent the witness's testimony, or "attempt[ing] to do so." 18 U.S.C. § 1512(b) (emphasis added). The statute also criminalizes "corruptly . . . obstruct[ing], influenc[ing], or imped[ing] any official proceeding, or attempt[ing] to do so." *Id.* § 1512(c)(2).

## B. *Hernandez* and *Masterpol*

In Sampson's case, the government's theory of culpability under § 1503(a) was as follows: Sampson committed the *actus reus* of "endeavor[ing] to influence, obstruct, or impede, the due administration of justice" when he acted to acquire confidential information about witnesses in Ahmad's case. *Sampson* 2016, 2016 WL 756565, at *12. And because he did so with the intent to tamper (or, at least, with the intent to help others tamper) with those witnesses, Sampson possessed the

17

relevant *mens rea*. *See, e.g.*, Br. for Appellee 22 ("Sampson engaged in these acts of obstruction with the goal that the nonpublic law enforcement information he ultimately obtained would be used to tamper with witnesses . . . .").[8] Thus, the government argued that Sampson undertook conduct with an intent to witness tamper—that is, effectively, Sampson "endeavored" to witness tamper.[9] And because witness tampering is a form of obstruction of justice, *see, e.g.*, *Aguilar*, 515 U.S. at 615–16 (Scalia, *J.*, concurring in part and dissenting in part), it would seem that § 1503(a), by its plain text, proscribed Sampson's conduct.

Standing in the way of this commonsense conclusion, Sampson insists, are our decisions in *Hernandez* and *Masterpol*. *Hernandez* involved a defendant who threatened a witness in an effort to coerce him into handing over documentary evidence. *Hernandez*, 730 F.2d at 897. The government charged the defendant with one count of "witness tampering" under § 1512, and one count of "obstruction of justice" under § 1503(a). *Id.* The defendant conceded that § 1512 proscribed his conduct, but argued that "threatening a witness in order to obtain documentary

_____

[8] The government did not allege that Sampson *actually* tampered with any witness other than Ahmad. He was later acquitted of the witness tampering charge.

[9] The government deliberately chose not to charge Sampson for "attempted witness tampering" under § 1512 "in light of the remoteness of [Sampson's] actus reus from [actual] witness tampering." Br. for Appellee at 23.

evidence[] no longer f[ell] within the proscriptions of § 1503." *Id.* We agreed. *Id.* at

898–99. We based our holding on two pieces of evidence: (1) the fact that the Victim

and Witness Protection Act eliminated all explicit witness-related language from

§ 1503, and (2) a lone statement by one of the Act's sponsors that the Act was

designed to amend § 1503 so that "it w[ould] make no mention of, and provide no

protection to, supenaed [*sic*] witnesses." *Id.* (emphasis removed) (quoting 128

Cong. Rec. S. 26810). Accordingly, we explained that "intimidation and

harassment of witnesses should []henceforth be prosecuted under § 1512," and "no

longer . . . under § 1503." *Id.* at 899.

We expanded on this reasoning in *Masterpol*. The defendant in *Masterpol* was

charged under § 1503 for approaching witnesses in his own case and successfully

urging them to recant their testimony. *Masterpol*, 940 F.2d at 761. Notably, the

defendant did so without resort to physical force or threats. *See id.* at 763. At the

time of our decision in *Hernandez*, § 1512 would not have covered his conduct.

The version of the statute in effect at that time prohibited only witness tampering

that involved "intimidation or physical force," "threat[s]," or "engag[ing] in

misleading conduct." *See* P.L. 97-291, October 12, 1982, 96 Stat. 1248. Accordingly,

as the government in *Masterpol* noted, if § 1503 did not criminalize the defendant's

19

conduct, there would have been a gap; the defendant could not be charged under either § 1512 or § 1503. *Masterpol*, 940 F.2d at 763. We responded by noting that in 1988—"well before [the defendant's] obstructive conduct in January 1990"— Congress amended § 1512 to criminalize "corruptly persuad[ing]" a witness to delay or prevent testimony. *Id.* We thought that this amendment severely diminished the government's argument that § 1503 should apply, and we thus reversed the defendant's § 1503 conviction. *See id.*

Sampson argues that *Hernandez* and *Masterpol,* properly applied, mandate reversing his § 1503 conviction for endeavoring to witness tamper. We disagree. As noted above, *Hernandez* and *Masterpol* involved intimidating and threatening a witness, and corruptly persuading witnesses to recant their testimony. We decline today to extend the reasoning of *Hernandez* and *Masterpol* to bar any other sort of obstructive witness-related conduct from being prosecuted under § 1503. *See, e.g.*, *Mar. Ins. Co. v. Emery Air Freight Corp.*, 983 F.2d 437, 440–41 (2d Cir. 1993) (Meskill, *C.J.*) (concluding that a prior decision of this Court, though not overruled, should be limited to its facts); *S.A. Mineracao Da Trindade-Samitri v. Utah Int'l, Inc.*, 745 F.2d 190, 193 (2d Cir. 1984) (similar). To whatever extent that language in either *Hernandez* or *Masterpol* might be read to stand for broader propositions about the

20

propriety of prosecuting witness-related conduct under § 1503(a), we conclude that those statements are not binding. *See, e.g.*, *Ming Shi Xue v. Bd. of Immigration Appeals*, 439 F.3d 111, 121 (2d Cir. 2006) ("An opinion simply cannot hold more than the facts before it." (internal quotation marks omitted) (quoting *United States v. Garcia*, 413 F.3d 201, 232 n.2 (2d Cir. 2005) (Calabresi, *J.*, concurring))). Thus, because Sampson was charged and convicted under § 1503(a) for an inchoate endeavor to witness tamper—rather than for intimidating and threatening a witness or corruptly persuading a witness to recant her testimony—his § 1503(a) conviction was proper.

Two considerations undergird our decision today. First, it is undisputed that § 1503(a) proscribed endeavors to witness tamper before the Victim and Witness Protection Act amended it. And as *Hernandez* itself recognized, the goal of the Victim and Witness Protection Act was to "*strengthen* existing legal protections for victims and witnesses of federal crimes." *Hernandez*, 730 F.2d at 898 (emphasis added) (quoting S. Rep. No. 532, 97th Cong., 2d Sess. 9). That fact was less relevant in *Hernandez* and *Masterpol*, because it was undisputed in both of those cases that § 1512 proscribed the defendants' conduct. *See Masterpol*, 940 F.2d at 763; *Hernandez*, 730 F.2d at 897. But efforts to witness tamper that rise to the level

of an "endeavor" yet fall short of an "attempt" cannot be prosecuted under § 1512. *See* 18 U.S.C. §§ 1503(a), 1512(b), 1512(c)(2); *compare, e.g.*, *United States v. Desposito*, 704 F.3d 221, 231 (2d Cir. 2013) (concluding that an attempt must include "something more than mere preparation" (quoting *United States v. Farhane*, 634 F.3d 127, 147 (2d Cir. 2011))), *with Buffalano*, 727 F.2d at 53 ("[A]n 'endeavor' under § 1503 does not require proof that would support a charge of attempt . . . ."). Sampson's broad reading of *Hernandez* and *Masterpol*, then, would mean that neither § 1503 nor § 1512 currently covers mere "endeavors" to witness tamper. We believe that such a conclusion is implausible. Congress could not have possibly intended "in 1982 to *reduce* the protection afforded against soft witness tampering at the very time that it was trying to *expand* protection of witnesses." *LeMoure*, 474 F.3d at 41 (emphasis in original).[10]

Second, and perhaps more importantly, we are currently the only federal court of appeals to suggest that § 1503(a)'s omnibus clause does not proscribe

---

[10] *Masterpol*'s dicta suggesting that "to the extent a gap" exists between § 1503 and § 1512, "the proper remedy is not for the courts to distort the plain language of [the statute] but for Congress to enact legislation to close the gap," 940 F.2d at 763 (quoting *United States v. King*, 762 F.2d 232, 238 (2d Cir. 1985)), does not foreclose this conclusion. The *Masterpol* Court expressly acknowledged that its statement was informed in part by its conclusion that no such gap appeared in the case before it. *See id.* And our interpretation today requires no distortion of the text of § 1503(a)'s omnibus clause, but rather applies that text by its plain terms.

endeavors to obstruct justice that involve potential witness tampering. *See Bruno*, 383 F.3d at 87. And, quite frankly, our sister circuits' uniform rejection of our position appears warranted. For one thing, *Hernandez* began its analysis of § 1503(a) by examining its pre-1982 version (which included references to witness tampering), and then supplemented that analysis by examining § 1512's legislative history. *See Hernandez*, 730 F.2d at 898–99. At no point, however, did *Hernandez* examine the *actual text* of § 1503(a)'s omnibus clause, which the Victim and Witness Protection Act did not change. *See, e.g., Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016) ("Statutory interpretation, as we always say, begins with the text . . . ."); *Hui v. Castaneda*, 559 U.S. 799, 812 (2010) ("We are required . . . to read [a] statute according to its text."). The plain language of § 1503(a)'s omnibus clause clearly continues to cover witness tampering—unquestionably a form of "influenc[ing], obstruct[ing], or imped[ing] the due administration of justice." *See N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929, 942 (2017) ("What Congress ultimately agrees on is the text that it enacts, not the preferences expressed by certain legislators."). Moreover, *Hernandez* (and, by implication, *Masterpol*) appears simply to have disregarded the Supreme Court's "cardinal rule . . . that repeals by implication are not favored," *Morton v. Mancari*, 417 U.S. 535, 549 (1974) (quoting *Posadas v. Nat'l City Bank*, 296

23

U.S. 497, 503 (1936)), and that a court may not infer a statutory repeal "unless the later statute 'expressly contradict[s] the original act' or unless such a construction is absolutely necessary . . . in order that [the] words [of the later statute] shall have any meaning at all," *Traynor v. Turnage*, 485 U.S. 535, 548 (1988) (quoting *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976)). Neither of these circumstances is present in the case of § 1503(a), as amply demonstrated by the case law from all eight other circuits to have considered the issue.

These two considerations, taken together, lead us to conclude that *Hernandez* and *Masterpol* should not be extended beyond the precise situations that our Court confronted in those cases.[11] Thus, *Hernandez* and *Masterpol* bar the government from prosecuting an individual under § 1503(a) for intimidating and threatening witnesses or corruptly persuading witnesses to recant their testimony. They do not, however, bar the government from prosecuting an individual under § 1503(a) for an inchoate endeavor to witness tamper. We therefore affirm Sampson's § 1503(a) conviction.

---

[11] Given this disposition, we leave to another day the question of whether our decisions in *Hernandez* and *Masterpol* should be overruled by our *en banc* Court.

## II

Sampson next argues that even assuming § 1503(a) properly applies, his conviction on Count 4 still must be vacated because the district court failed to instruct the jury properly. In addition to charging Sampson as a principal under § 1503(a), the government charged, in the alternative, that by encouraging Noel to search through the USAO's classified database for information on witnesses in Ahmad's case, Sampson "willfully caused" Noel to violate § 1503(a), thereby rendering Sampson liable as an aider and abettor.[12] Sampson contends that the district court failed to instruct the jury properly as to the *mens rea* necessary for him to have aided and abetted a violation of § 1503(a). The parties dispute whether we should review this alleged error *de novo* or for "plain error." We need not decide the point, however, because even assuming *de novo* review applies, we conclude that vacatur is not warranted.

Under our *de novo* review standard, "[t]o secure reversal based on a flawed jury instruction, a defendant must demonstrate both error and ensuing prejudice." *United States v. Quinones*, 511 F.3d 289, 313–14 (2d Cir. 2007). To demonstrate error,

---

[12] Pursuant to 18 U.S.C. § 2(b), "[w]hoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

25

the defendant must show that, "as a whole," the charge "either failed to inform the jury adequately of the law or misled the jury about the correct legal rule." *United States v. McIntosh*, 753 F.3d 388, 392 (2d Cir. 2014) (per curiam) (quoting *United States v. White*, 552 F.3d 240, 246 (2d Cir. 2009)). "An erroneous instruction, unless harmless, requires a new trial." *Quattrone*, 441 F.3d at 177 (quoting *Anderson v. Branen*, 17 F.3d 552, 556 (2d Cir. 1994)).

Here, the district court's aiding and abetting instruction reads as follows:

In addition to charging the defendant as a principal, the government has charged the defendant under [an] alternate theory that even if the defendant did not commit the crime charged in Count [Four], the defendant willfully caused another person to physically commit the crime. Thus, you may find that the defendant acted as an aider and abettor if you find that the government has proven beyond a reasonable doubt that he knowingly, willfully and *corruptly* caused another person to obstruct justice, as I just defined it. . . .

What does the term "willfully caused" mean? It does not mean that the defendant himself need have physically committed the crime, or supervised, or participated in the actual criminal conduct charged in the indictment. The meaning of the term "willfully caused" can be found in the answers to the following questions:

[1] Did the defendant in or about and between July 2011 and July 2012 know that there was a federal proceeding pending before a federal judge or a court; that is the federal prosecution of Edul Ahmad, in the United States District Court of the Eastern District of New York?

26

[2] Did the defendant *intentionally* cause another person to obstruct, impede, or influence or corruptly endeavor to obstruct, impede or influence the federal prosecution of Edul Ahmad by obtaining nonpublic information contained in the government's files or computer databases?

If the jury is unanimously persuaded beyond a reasonable doubt that the answer to both of these questions is yes, then the defendant is an aider and abettor and is guilty of Count [Four], just as if he had actually committed [the underlying crime].

Supp. App'x at 26–28 (emphasis added).

Under our case law, § 2(b) aiding and abetting offenses consist of both an *actus reus* and a *mens rea*. The *actus reus* is that the defendant caused another person to commit the requisite act. *United States v. Whab*, 355 F.3d 155, 161 n.3 (2d Cir. 2004) (citing *United States v. Gabriel*, 125 F.3d 89, 101 (2d Cir. 1997)). The *mens rea* is that the defendant acted "with the mental state necessary" to commit the crime he aided and abetted. *Id.* (emphasis removed) (quoting *Gabriel*, 125 F.3d at 101). A defendant is thus liable for aiding and abetting another person's violation of § 1503(a) if the defendant: (1) caused that person to "corruptly . . . endeavor[] to influence, obstruct, or impede, the due administration of justice," § 1503(a) (*i.e.*, the *actus reus*); and (2) did so with "corrupt" intent—that is, with a "specific intent to obstruct a federal judicial or grand jury proceeding," *Schwarz*, 283 F.3d at 109 (*i.e.*, the *mens rea*). Here, Sampson argues that the district court failed to instruct

27

the jury properly as to the requisite *mens rea*—that he "corruptly" caused Noel's offense. For the following reasons, we disagree.

Sampson points to the district court's instruction that Sampson would be liable under § 2(b) if the following two facts were true: (1) Sampson knew about Ahmad's pending federal prosecution, and (2) Sampson "intentionally cause[d] [Noel] to . . . obstruct, impede, or influence or corruptly endeavor to obstruct, impede, or influence" that prosecution. Supp. App'x at 27. The judge had also explained in an earlier instruction that "[b]efore [the jury] can find that the defendant acted intentionally, [it] must be satisfied beyond a reasonable doubt that the defendant acted deliberately and purposefully." T. 2465.

Sampson correctly notes that in this portion of the instruction, the district court did not explicitly affirm that Sampson needed to have acted "corruptly," *i.e.*, with "a specific intent to obstruct a federal judicial or grand jury proceeding," *Schwarz*, 283 F.3d at 109. Reading the jury instruction "as a whole," however, as we must, *see McIntosh*, 753 F.3d at 392, we believe that it sufficiently conveys the point. As an initial matter, the aiding and abetting instruction begins with the affirmation that the jury may find Sampson guilty if he "knowingly, willfully *and corruptly* caused another person to obstruct justice," Supp. App'x at 27 (emphasis

28

added). *See United States v. Mitchell*, 328 F.3d 77, 82 (2d Cir. 2003) ("We review a jury charge in its entirety and not on the basis of excerpts taken out of context." (quoting *United States v. Zvi*, 168 F.3d 49, 58 (2d Cir. 1998))). The judge had elsewhere defined "corruptly" to mean acting "with an improper purpose" and "knowingly and dishonestly, and with the intent to obstruct, impede or influence the due administration of justice." Gov't App'x at 200–01.

Moreover, even as to the portion of the instruction on which Sampson focuses his attention, the district court charged that Sampson needed to have "*intentionally* cause[d]" Noel to endeavor to obstruct justice. Supp. App'x at 27 (emphasis added). As noted above, the district court had previously told the jury that a person acts "intentionally" when he acts "deliberately and purposefully." T. 2465. Thus, the district court effectively told the jury that Sampson must have *deliberately and purposefully* "cause[d] [Noel] to . . . obstruct, impede, or influence or corruptly endeavor to obstruct, impede, or influence" Ahmed's prosecution. Supp. App'x at 27. This instruction is sufficiently near to the precise words preferred by Sampson—*i.e.*, that Sampson needed to have acted with "a specific intent to obstruct" Ahmed's prosecution—that we are unable to discern how the jury could have been misled. That is especially so when this language is properly

29

placed in the context of the instruction's earlier admonition that Sampson may be liable under an aiding and abetting theory if the government proved "that he knowingly, willfully, and *corruptly* caused another person to obstruct justice." *Id.* (emphasis added). In short, Sampson has not shown a basis for setting aside his conviction on Count 4. We reject his argument to the contrary.

### III

Sampson next challenges his conviction on Count 9 for providing a false statement to federal officials in violation of 18 U.S.C. § 1001(a)(2) when he told Agents Hosey and Zacher that he "did not recall seeing [Ahmad's] Check Register Page previously."[13] App'x at 83. Agent Hosey, who showed Sampson the check register page photocopy, testified to the following exchange with Sampson:

> Q: [W]hat was the defendant's response when you asked him if he had seen the check register page before?
> A: When I asked him if he had seen it before, he said he had not.

---

[13] 18 U.S.C. § 1001(a)(2) criminalizes, "in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully . . . mak[ing] any materially false, fictitious, or fraudulent statement or representation." To secure a conviction under this statute, the government must prove beyond a reasonable doubt that the defendant "(1) knowingly and willfully, (2) made a materially false, fictitious, or fraudulent statement, (3) in relation to a matter within the jurisdiction of a department or agency of the United States, (4) with knowledge that it was false or fictitious or fraudulent." *United States v. Litvak*, 808 F.3d 160, 170 (2d Cir. 2015) (emphasis removed) (quoting *United States v. Coplan*, 703 F.3d 46, 78 (2d Cir. 2012)).

Q: Did [Sampson] appear to you to have any problem understanding your question regarding whether he'd seen this check register page before?

A: No. In fact, he said – his quotes were it didn't ring a bell, and he didn't have a recollection from it.

Q: Did he ask for any clarification regarding the question you asked about the check register page?

A: He said if he could check his files or there was more information, he may be able to recall.

*Id.* at 780. Sampson makes three arguments as to why the evidence was insufficient to show that his statement concerning the check register page violated § 1001(a)(2). We reject all three.

Sampson first argues that his statement to Agent Hosey was literally correct, and therefore cannot be the basis for a § 1001(a)(2) conviction. Specifically, Sampson contends that Agent Hosey asked him if he recognized the *FBI's photocopy* of the check register page, which Sampson had indeed never seen. Sampson therefore argues that his response to Agent Hosey, although misleading, was literally true. But even assuming *arguendo* that a literally truthful statement cannot be the basis for a § 1001 charge,[14] Sampson's argument is without merit.

---

[14] We have suggested as much in dicta but have not squarely decided it in a precedential opinion. *See United States v. Mandanici*, 729 F.2d 914, 921 (2d Cir. 1984) (citing *Bronston v. United States*, 409 U.S. 352, 359–62 (1973)); *but cf. United States v. Harrod*, 981 F.2d 1171, 1175 (10th Cir. 1992) ("*Bronston* was decided under the federal perjury statute, 18 U.S.C. § 1621, which implicates significantly different policy concerns than does a prosecution under 18 U.S.C. § 1001.").

At the start, Agent Hosey did not testify as to the exact phrasing of his question, so the record is not clear whether Agent Hosey in fact asked, "Have you seen this document before?" But even assuming *arguendo* that he did, there was nothing "true"—literally or otherwise—about Sampson's response. Sampson did not simply answer Agent Hosey's question with a "no." According to Agent Hosey, "his quotes were *it didn't ring a bell*, and *he didn't have a recollection from it.*" *Id.* at 780 (emphasis added). In other words, Sampson did not merely tell Agent Hosey that he had never seen the precise document being presented to him. Sampson insisted that the document did not look familiar to him, and that it did not resemble any document that he had previously seen. *See United States v. Schafrick*, 871 F.2d 300, 303 (2d Cir. 1989) (noting that a responsive statement "must be judged according to common sense standards"). Moreover, Sampson claimed that "if he could check his files or there was more information, he may be able to recall." App'x at 780. In context, here, too, Sampson was asserting that he could not recall seeing any document similar to the photocopy that Agent Hosey was showing him. Sampson could not have possibly meant that he might somehow find, in his own files, the very same photocopy of the check register page. *See Schafrick*, 871 F.2d at 304 ("If, in the context in which the statements were made,

32

they were materially untrue, then [a violation] is established. This is so even if the statements could be literally true in isolation . . . .").

The jury thus had more than an ample basis on which to conclude that Sampson's response to Agent Hosey's question was false. *See United States v. Garavito-Garcia*, 827 F.3d 242, 248 (2d Cir. 2016) (noting that a defendant challenging the sufficiency of the evidence "bears a heavy burden," and that a conviction will be upheld "if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (quoting *United States v. Allen*, 788 F.3d 61, 66 (2d Cir. 2015))). Ahmad testified that he had previously shown Sampson a copy of the check register page, telling him that it was responsive to a government subpoena and that Ahmad needed his advice. According to Ahmad, Sampson instructed Ahmad to lie to the government about the document's existence. Sampson then took the copy from Ahmad and did not return it. Given this testimony, and viewing the evidence in the light most favorable to the government, a reasonable jury had sufficient basis to conclude beyond a reasonable doubt that Sampson knew at the time of his interview with Agent Hosey that he had previously seen a document resembling the one that

Agent Hosey showed him, and that he falsely claimed that he did not remember having seen such a document.

Sampson next contends that the evidence was insufficient to show that he intended to deceive Agent Hosey and his colleague, Agent Zacher. The district court instructed the jury that a statement or representation is "false or fictitious" under § 1001(a)(2) "if it was untrue when made, and known at the time to be untrue, by the person making it or causing it to be made." T. 2499. It further instructed that a statement or representation is "fraudulent" under § 1001(a)(2) "if it was untrue when made and was made, or caused to be made, with the intent to deceive the government agency to which it was submitted." *Id.* Sampson does not challenge these instructions. Accordingly, to convict him of this charge, the jury needed only to conclude that Sampson knew that his statement to the agents regarding the check register page—namely, that he did not remember having seen such a document—was false when he made it. The evidence was sufficient to support such a conclusion: the jury was entitled to find that Sampson was aware that his statement was false, and that he did in fact remember having seen the check register document. And even assuming *arguendo* that the government had to prove an "intent to deceive" to secure a conviction under § 1001(a)(2), we again

34

disagree that the evidence against Sampson was insufficient. As noted above, Ahmad testified that Sampson told him to lie about the check register page, and Sampson took the copy without returning it, presumably to prevent it from being turned over to the authorities. This evidence is more than adequate to support the conclusion that when Sampson told the agents that the check register page photocopy "didn't ring a bell," he intended to deceive them.

Finally, Sampson maintains that Agent Hosey's question was "fundamentally ambiguous," *see, e.g.*, *United States v. Lighte*, 782 F.2d 367, 375 (2d Cir. 1986), and therefore cannot serve as a basis for a § 1001(a)(2) conviction. This argument, too, is without merit.[15] The evidence was more than sufficient for a reasonable jury to conclude that Agent Hosey's question was not fundamentally ambiguous—and thus that Sampson, understanding the question, lied. As we insisted in *Lighte*, "[i]f the response given was false as the defendant understood the question, his conviction is not invalidated by the fact that his answer to the question might generate a number of different interpretations." *Id.* (quoting *United States v. Williams*, 552 F.2d 226, 229 (8th Cir. 1977)). Taken together, Sampson's

---

[15] We will assume *arguendo*, and without deciding, that the standards applicable to perjury under 18 U.S.C. § 1623, as discussed in *Lighte*, apply equally to Sampson's offense under § 1001(a)(2).

response to Agent Hosey's question and his earlier dealings with Ahmad involving the check register page provided sufficient evidence for a reasonable jury to conclude beyond a reasonable doubt that Sampson interpreted the question as Agent Hosey intended and that Sampson knowingly made a false statement in reply. Accordingly, Sampson's challenge to his conviction on Count 9 fails.

## IV

Sampson next challenges his conviction on Count 11, contending that the district court erred in refusing to admit certain evidence, and in refusing to allow Sampson's attorney to ask a question of Agent Hosey during cross-examination. Count 11 charged Sampson with violating § 1001(a)(2) by telling Agents Hosey and Zacher that he never asked his Senate staffer to help with the liquor store's tax issues. At trial, the government elicited testimony from Agent Hosey as to how Sampson responded when questioned about whether he "had asked the Senate staff[er] to assist" the business partner "regarding the liquor store." App'x at 782. Agent Hosey responded that Sampson "stated he had not and said that he would not put pressure on his staff to make that kind of inquiry." *Id*.

During cross-examination, Sampson sought to introduce notes taken by Agent Zacher during the interview. Sampson offered the notes for two purposes:

36

(1) to demonstrate that Sampson's statement that "he had not" asked the Senate staffer for assistance concerning the liquor store did not appear in the notes, which cast doubt on whether Sampson made this statement, and (2) to show that the structure of Agent Hosey's interview may have confused Sampson, and perhaps caused him to provide a false statement unintentionally. The government objected, asserting that the notes were hearsay. The judge sustained the government's objection. Sampson argues on appeal that the district court erred in refusing to admit the notes.

In addition, and also on cross-examination of Agent Hosey, Sampson's attorney attempted to ask him, "Isn't it a fact that John Sampson did not deny that he had asked his staff to assist?" *Id.* at 797. The government objected, and the judge sustained the objection. Sampson's attorney did not rephrase the question, but simply moved onto another topic. Sampson argues that the district court erred in refusing to allow his attorney to ask this question, and that the district court's evidentiary rulings also violated his Confrontation Clause rights.

"We review evidentiary rulings, including a trial court's decision to limit the scope of cross-examination, for abuse of discretion." *United States v. White*, 692 F.3d 235, 244 (2d Cir. 2012). This is a "deferential" standard. *Gallego v. Northland*

*Grp. Inc.*, 814 F.3d 123, 129 (2d Cir. 2016). We may find abuse of discretion only if: (1) the decision "cannot be located within the range of permissible decisions," (2) the decision rests on a "clearly erroneous factual finding," or (3) the decision "rests on an error of law." *Id.* (quoting *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010)). Furthermore, "[a] district court is accorded broad discretion in controlling the scope and extent of cross-examination," and "may impose reasonable limits on cross-examination to protect against, *e.g.,* harassment, prejudice, confusion, and waste." *United States v. Ulbricht*, 858 F.3d 71, 118 (2d Cir. 2017) (quoting *United States v. James*, 712 F.3d 79, 103 (2d Cir. 2013)). Thus, although the Sixth Amendment's Confrontation Clause gives "a defendant the right not only to cross-examination, but to effective cross-examination," "'[i]t does not follow . . . that the Confrontation Clause prevents a trial judge from imposing *any* limits' on defense counsel's cross-examination of government witnesses." *Id.* (quoting *James*, 712 F.3d at 103).

We conclude that the district court did not abuse its discretion—or violate the Confrontation Clause—in either of its evidentiary rulings. First, Agent Zacher's notes were hearsay not shown to fall within any exception, and were therefore inadmissible under Federal Rule of Evidence 802. Sampson offered

Agent Zacher's notes to prove the truth of their contents—*i.e.,* he was offering them as an accurate reflection of what occurred during his interview with the FBI. This was improper. The district court explicitly allowed Sampson to raise the relevant information by cross-examining Agent Hosey without admitting the notes. *See* App'x at 799 ("You can ask [Agent Hosey about the structure of the interview] in a completely different way that doesn't violate my ruling [that the notes are inadmissible]. [']Did you ask him questions about various topics?['] [']Did you return to various topics after asking other questions?['] [']Yes or no?['] That's it, and you've got your point, and move on.").[16] Moreover, Sampson could have called and examined Agent Zacher herself, if Sampson had so wished. Agent Zacher's notes, however, were inadmissible hearsay. The district court did not abuse its discretion in refusing to allow Sampson to introduce them.[17]

---

[16] Sampson contends that the district court failed to provide him with this opportunity in practice, but the record shows that Agent Hosey agreed during cross-examination that the interview "went from one area of discussion . . . to another area and returned back to previous areas of discussion," and that the discussions of the liquor store and tax matters were separated by other topics. *See* App'x at 800–01.

[17] We similarly conclude that the district court did not violate Sampson's Confrontation Clause rights by refusing to admit Agent Zacher's notes; as noted above, Sampson was perfectly free to call Agent Zacher to the stand and question her directly. *See, e.g., Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) ("[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (emphasis in original)).

Second, the district court did not violate Sampson's Confrontation Clause rights by sustaining the government's objection to Sampson's question. As noted above, a district court can, consistent with the Confrontation Clause, impose reasonable limits on cross-examination to prevent "harassment, prejudice, confusion, and waste." *Ulbricht*, 858 F.3d at 118 (quoting *James*, 712 F.3d at 103). Here, the trial transcript provides ample basis for the district court's apparent view that, in asking Agent Hosey about Sampson's denial, Sampson's attorney was "trying . . . to work an end run around [the district court's] rulings" by referring to evidence that the district court had already deemed inadmissible hearsay (that is, Agent Zacher's notes). T. 2182. This ruling did not exceed the bounds of the "broad discretion" afforded to district courts in limiting the "scope and extent" of cross-examination. *Ulbricht*, 858 F.3d at 118 (quoting *James*, 712 F.3d at 103). The district court did not forbid Sampson's attorney from continuing with this line of questioning *per se*, and Sampson's attorney did not attempt to rephrase the question, but instead moved on. Under these circumstances, we do not believe the district court violated Sampson's Confrontation Clause rights in sustaining the government's objection to a single question.

Next, Sampson argues that it was unfairly prejudicial for the district court to admit evidence that Sampson had allegedly engaged in bribery. The government sought a pretrial ruling that it could introduce evidence that Sampson had engaged in political favors for Ahmad once Sampson made clear that he would not repay the money he had borrowed. The district court allowed the government to present this evidence at trial for (at least) two different purposes. *See United States v. Sampson*, No. 13-CR-269 S-5 DLI, 2015 WL 2066073, at *6 (E.D.N.Y. May 4, 2015) ("*Sampson* 2015"). The first purpose was to demonstrate Sampson's motive for endeavoring to obstruct Ahmad's prosecution—that is, to prevent Ahmad from cooperating with the government and potentially giving the government incriminating information. *Id.* The second purpose was to establish, for Counts 5 and 6, that Sampson "hinder[ed], delay[ed], or prevent[ed] the communication to a law enforcement officer . . . information relating to the commission or possible commission of a [f]ederal offense" under 18 U.S.C. § 1512(b)(3). *Id.* The district court balanced the evidence's probative value against its danger of unfair prejudice, pursuant to Federal Rule of Evidence 403, and determined that the evidence was "more probative than prejudicial." *Id.* at *7.

41

Upon Sampson's request, the district court also cautioned the jury repeatedly that Sampson was not on trial for bribery, and that this evidence should not be considered for purposes other than those outlined above.

On appeal, Sampson challenges the admission of the evidence directly to prove Counts 5 and 6, which involved Sampson's alleged efforts to prevent law enforcement agents from learning of information relating to the commission of a "federal offense." Under the government's theory at trial, the relevant "federal offense" under § 1512(b)(3) was Sampson's alleged violation of the federal bribery statute, 18 U.S.C. § 201(b)(2)(A). That provision forbids public officials from, *inter alia*, "corruptly . . . receiv[ing] . . . anything of value"—such as relief from a $188,500 loan—"in return for being influenced in the performance of any official act." After Sampson's trial, the Supreme Court decided *McDonnell v. United States*, 136 S. Ct. 2355 (2016), which narrowed the scope of the term "official act" in this statute, *see id.* at 2371–72. As a result, Sampson argues, § 201(b)(2)(A) no longer reaches his conduct with respect to Ahmad and the $188,500 loan, so that this conduct is not currently a "federal offense" under § 1512(b)(3). Because the jury ultimately acquitted Sampson on the charges that he violated § 1512(b)(3), this

issue is largely moot. Nonetheless, Sampson now argues that *McDonnell* makes clear that the evidence of his alleged bribery was unfairly prejudicial at trial.

We disagree. "Under Rule 403, so long as the district court has conscientiously balanced the proffered evidence's probative value with the risk for prejudice, its conclusion will be disturbed only if it is arbitrary or irrational." *United States v. Awadallah*, 436 F.3d 125, 131 (2d Cir. 2006). Here, the evidence of Sampson's purported bribery was highly probative—and not merely for the purposes of demonstrating that he violated § 1512(b)(3). The prosecution's theory was that Sampson *thought* that he was committing a federal offense—a belief that a person in his position might well have entertained, given our Circuit's pre-*McDonnell* precedent. *See Silver*, 864 F.3d at 118–19 & n.88. The evidence thus tended to establish that Sampson acted as he did to prevent Ahmad from cooperating with law enforcement—*i.e.*, that the alleged bribery motivated him to endeavor to obstruct justice. *See Sampson* 2015, 2015 WL 2066073, at *6 ("[T]he bribery evidence completes the story of the crime on trial and explains [Sampson's] actions with regard to the federal investigation. It also provides a motive for the crime [and] tends to prove intent . . . .").

43

Of course, the district court needed to weigh the probative value of this evidence against the danger that it would inflame the jury, or that the jury would be inclined to "declar[e] guilt on a ground different from . . . the offense charged," *Old Chief v. United States*, 519 U.S. 172, 180 (1997). The district court did so, however, and determined that the "clear probative value [of the evidence] outweigh[ed] any prejudicial effect on [Sampson]," and that "limiting instructions [would] limit any potential harm to [him]." *Sampson* 2015, 2015 WL 2066073, at *7. We believe that this decision was neither "arbitrary" nor "irrational," *Awadallah*, 436 F.3d at 131, and we therefore reject Sampson's argument that his conviction should be vacated on this basis.

## VI

Finally, Sampson challenges the reasonableness of his sentence. As noted above, the district court sentenced Sampson to 60 months of imprisonment on Counts 4, 9, and 11, with each sentence to be served concurrently. "We review sentences 'under a deferential abuse-of-discretion standard.'" *United States v. Young*, 811 F.3d 592, 598 (2d Cir. 2016) (quoting *Gall v. United States*, 552 U.S. 38, 41 (2007)). We examine sentences for both "procedural" and "substantive" reasonableness. *United States v. Delacruz*, 862 F.3d 163, 178 (2d Cir. 2017). "A

44

sentence is procedurally unreasonable if the district court fails to calculate (or improperly calculates) the Sentencing Guidelines range, treats the Sentencing Guidelines as mandatory, fails to consider the § 3553(a) factors, selects a sentence based on clearly erroneous facts, or fails adequately to explain the chosen sentence." *Ulbricht*, 858 F.3d at 124 (quoting *United States v. Jesurum*, 819 F.3d 667, 670 (2d Cir. 2016)). And a sentence is "substantively unreasonable" if the sentence "cannot be located within the range of permissible decisions . . . tak[ing] into account the totality of the circumstances, giving due deference to the sentencing judge's exercise of discretion, and bearing in mind the institutional advantages of district courts." *Young*, 811 F.3d at 598–99 (first quoting *United States v. Tutty*, 612 F.3d 128, 131 (2d Cir. 2010); then quoting *United States v. Chu*, 714 F.3d 742, 746 (2d Cir. 2013)).

Sampson challenges his sentence on four grounds. First, Sampson argues that the district court improperly imposed an additional 16-level enhancement to his offense level per U.S.S.G. §§ 2X3.1 and 2B1.1(b). Second, he claims that the district court erred in imposing an "abuse of public trust" enhancement under U.S.S.G. § 3B1.3. Third, he insists that the district court failed to provide an adequate justification for varying upward from the Guidelines sentencing range

of 37 to 46 months. Finally, he contends that his sentence creates "unwarranted disparities." Br. for Def.-Appellant at 61. We reject all four of Sampson's arguments.

**A. The 16-Level Enhancement**

Section 2J1.2(c) of the Sentencing Guidelines instructs that if an individual commits an offense that involves obstructing a criminal investigation or prosecution, the sentencing court should apply § 2X3.1, the Guideline for "accessory after the fact." U.S.S.G. § 2J1.2(c) (2016). Pursuant to § 2X3.1(a)(1), except in circumstances not applicable here, an individual's base offense level should be six levels lower than the offense level for the underlying offense. Application Note 1 to § 2X3.1 explains that the sentencing court should "[a]pply the base offense level [for the underlying offense] plus any applicable special offense characteristics that were known, or reasonably should have been known, by the defendant."

Because Sampson was convicted of endeavoring to obstruct Ahmad's criminal prosecution for mortgage fraud, the district court referred to § 2B1.1—the Guideline for "fraud and deceit"—to calculate what the offense level might have been for Ahmad's underlying mortgage fraud. Section 2B1.1(b)(1) imposes a "special offense characteristic" enhancement for fraud, depending on the amount

46

of the loss, *see* Application Note 3(A). Under § 2B1.1(b)(1)(I), if the intended or actual loss caused by the fraud was for more than $1.5 million, the sentencing court should increase the defendant's sentence by 16 levels. Read in conjunction with Application Note 1 to § 2X3.1, then, the district court should have imposed this 16-level sentence enhancement only if Sampson "kn[ew], or reasonably should have . . . known" that Ahmad had committed fraud, and that this fraud was for a sum greater than $1.5 million. At sentencing, the district court concluded, "based on the evidence that was adduced at trial and the inferences that could be drawn from it," that Sampson either knew or should have known that Ahmad was engaging in a fraud of this scale—to wit, approximately $3 million. App'x at 1114–15.

Sampson argues that "[t]here [was] no factual basis" for the district court "to conclude that Sampson knew or should have known Ahmad committed fraud, let alone a fraud" over the requisite $1.5 million threshold. Br. for Def.-Appellant 51. Because Sampson is challenging the district court's factual findings on this issue, we may vacate only if the district court committed clear error. *See Ulbricht*, 858 F.3d at 124. "To hold that a factual finding is 'clearly erroneous,' we must be left with the definite and firm conviction that a mistake has been committed." *Id.* (internal quotation marks omitted). "Where there are two permissible views of the

evidence, the [sentencing judge's] choice between them cannot be clearly erroneous." *Id.* (internal quotation marks omitted).

Here, there was no "clear error" in the district court's determination that Sampson knew (or reasonably should have known) about Ahmad's mortgage fraud, as well as its value. First and foremost, the evidence suggests that Sampson was aware that New York State regulators were investigating Ahmad's business, and he knew that Ahmad had received inquiries from these regulators concerning forged signatures on some of Ahmad's documents. Sampson even advised Ahmad to submit an affidavit denying that Ahmad knew about the forged signatures, and told him that he "should let Prem [Ahmad's business partner] take the blame on this," since "Prem didn't have anything to lose." App'x at 197. Furthermore, during a recorded conversation, Sampson strongly implied that he understood that Ahmad was committing fraud, and told Ahmad that he needed to use different language when conversing with him in the future so that Sampson would have plausible deniability. *See* Gov't App'x at 76–77 ("[AHMAD:] '[F]or example, Nazir, he bought houses for me. Steve bought houses for me.' . . . [SAMPSON:] 'He didn't buy houses, no, no, no, Ed, he did not buy houses for you. You and Nazir, you're an investor [*sic*]. Nobody bought houses for you. You got to get that

mindset out. Nobody bought houses for you."). In addition, during his recorded conversation with Flagg, Sampson expressed familiarity with the government's publicly filed indictment in Ahmad's case, which alleged that Ahmad's fraud was worth over $50 million. Given the evidence that Sampson knew of Ahmad's wealth, and that he knew Ahmad was engaging in fraud to augment this wealth, we do not believe that it was "clear error" for the district court to conclude that, at the very least, Sampson "should have known" that Ahmad was defrauding individuals in an amount greater than $1.5 million.

## B. The Abuse of Public Trust Enhancement

Section § 3B1.3 of the Guidelines instructs that if the defendant "abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense," the sentencing court should increase the defendant's sentence by two levels. The district court held that this enhancement was warranted because "a lot of what [Sampson] did actually involved his status as an attorney." App'x at 1115.

"The determination of whether a defendant utilized a position of trust or special skill in a manner that significantly facilitated the commission or concealment of the offense is a question of fact reviewed for clear error." *United States v. Thorn*, 446 F.3d 378, 388 (2d Cir. 2006). Here, the district court did not

clearly err in determining that Sampson utilized his "special skill[s]" as an attorney to "significantly facilitate[]" the commission of the offense. Comment 4 to § 3B1.3 defines "special skill" as "a skill not possessed by members of the general public and usually requiring substantial education, training, or licensing," and lists "lawyers" as a class of individuals possessing a "special skill." The district court determined that Sampson relied on his skills as an attorney in his endeavors to obstruct justice, including: (1) his knowledge of "how criminal cases developed," and at what point in the investigatory process "witnesses would be identified"; (2) his knowledge of how the USAO worked, so that he could give specific directions to Noel; (3) his knowledge of the criminal justice system so that he could instruct Flagg accordingly in terms of acquiring information; and (4) his "knowledge and relationships developed as an attorney in criminal cases" in determining which attorneys to hire for Ahmad's co-defendants. *See* App'x at 1115–17. The fact that Sampson's offenses did not directly relate to his status as an attorney and could have been committed by a layperson is "immaterial," because the dispositive question is simply whether Sampson's "special skills increase[d] his chances of succeeding or of avoiding detection." *United States v. Fritzson*, 979 F.2d 21, 22 (2d

Cir. 1992). We identify no "clear error" in the district court's answering this question in the affirmative.

### C. Upward Deviation

A sentencing court "has broad latitude to impose either a Guidelines sentence or a non-Guidelines sentence." *Ulbricht*, 858 F.3d at 123 (internal quotation marks omitted). The judge may depart upward from a Guidelines range as long as she "give[s] serious consideration to the extent of any departure from the Guidelines" and provides an "adequate[] expla[nation]" that "allow[s] for meaningful appellate review and . . . promote[s] the perception of fair sentencing." *Gall*, 552 U.S. at 46, 50. She "must [also] make an individualized assessment based on the facts presented," and consider the factors outlined in 18 U.S.C. § 3553(a). *Id.* at 49–50. These factors include "the history and characteristics of the defendant," and "the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a).

In Sampson's case, the district court provided ample justification for its upward deviation, in a statement that spans nine full pages of the sentencing transcript. *See* App'x at 1151–60. Among other things, the district court considered: (1) Sampson's embezzlement, which the district court believed was time-barred

51

from prosecution but could nonetheless factor into the analysis as pertaining to Sampson's "history";[18] (2) the fact that Sampson breached both the trust of the New York State Bar and the New York State Supreme Court; (3) Sampson's failure to observe his suspension from the Bar even after his conviction and while he was awaiting sentencing; and (4) Sampson's abuse of his role as a state senator to obstruct regulatory investigations of Ahmad's businesses. The district court ultimately concluded that "[t]here has to be a sense that we give to the public that we are going to safeguard the integrity of our system. . . . That we will hold our public officials to a higher standard, that we will hold our attorneys to a higher standard." *Id.* at 1159–60. This explanation is far more than the "brief statement of reasons" that generally suffices to enable appellate review of an upward departure, *United States v. Cavera*, 550 F.3d 180, 193 (2d Cir. 2008) (*en banc*), and because we cannot second guess the district court's weighing of the relevant sentencing factors, *see United States v. Romano*, 794 F.3d 317, 339 (2d Cir. 2015), we reject Sampson's argument that the district court failed adequately to justify its upward deviation.

---

[18] As noted above, in *United States v. Sampson*, No. 15-2869-cr (2d Cir. 2018), we vacated the district court's dismissal of the embezzlement counts and reinstated both counts.

**D. Unwarranted Disparities**

Finally, Sampson argues that there is an unwarranted disparity between his sentence and the sentence of former New York State Senator Dean Skelos ("Skelos"), who—in a completely unrelated case—was convicted on eight corruption counts.[19] This argument is meritless. "Although 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct' is a factor district courts must consider" under 18 U.S.C. § 3553(a)(6) when imposing a sentence, "that provision does not require a district court to conform its sentence to any single other sentence adduced by a defendant." *United States v. Halloran*, 821 F.3d 321, 341 (2d Cir. 2016); *see also id.* (upholding a district court's decision not to consider "the two-year sentence imposed upon former Virginia Governor Bob McDonnell in an unrelated bribery case in the Eastern District of Virginia"). Indeed, the "primary purpose" of § 3553(a)(6) is "to reduce unwarranted sentence disparities" on a *nationwide* level. *United States v. Johnson*, 505 F.3d 120, 123 (2d Cir. 2007) (quoting *United States v. Wills*, 476 F.3d 103, 109 (2d Cir. 2007)). Sampson's opening brief on appeal does

---

[19] This Court vacated Skelos's judgment of conviction on September 26, 2017 and remanded for further proceedings in light of the Supreme Court's decision in *McDonnell*. *See United States v. Skelos*, 707 F. App'x 733 (2d Cir. 2017).

not discuss nationwide sentencing disparities, focusing solely on the Skelos sentence. And although Sampson's reply brief includes, in a footnote, a statistic on nationwide sentences for obstruction and federal false statement convictions, it is well-settled that we will not usually entertain an argument made for the first time in a reply brief. *See Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993). Even if we were to consider, however, the disparity that Sampson alleges between his sentence here and the purported national average and median sentences that he points to for obstruction of justice and false statement convictions, we would still find his argument unavailing. Sampson's argument gives no weight at all to the context that renders his crimes particularly worthy of opprobrium: his status as a lawyer and an elected public servant. The District Court was fully entitled to take that context into account when determining an appropriate sentence.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's January 27, 2017 judgment of conviction.